**CECIL CORLEY MOTOR COMPANY, INC. and Cecil Corley, Jr., Plaintiffs,**

v.

**GENERAL MOTORS CORPORATION and Paul Porter, Defendants.**

**Civ. A. No. 5572.**

United States District Court, M. D. Tennessee, Nashville Division.

July 17, 1974.

Gareth S. Aden, Harland Dodson, III, Nashville, Tenn., for plaintiffs.

Wm. F. Carpenter, Richard D. Speight, William H. Woods, Goodpasture, Carpenter, Woods & Sasser, Nashville, Tenn., Julius L. Russu, William B. Slowey, Jr., General Motors Corp., Detroit, Mich., for General Motors Corp.

John C. Tune, Jr., Nashville, Tenn., for Paul Porter.

## MEMORANDUM

MORTON, District Judge.

After jury trial and verdict in favor of the corporate plaintiff, Cecil Corley Motor Company, Inc., but not for the individual plaintiff, Cecil Corley, Jr., this civil private antitrust, breach of contract and Dealers Day In Court action is now before the Court on General Motors' motion for judgment notwithstanding the verdict under Fed.Rules Civ.Proc. 50(b), or a new trial, Fed.Rules Civ. Proc. 59.

The Court has carefully re-examined the evidence in light of the briefs, and by a direct review of the transcript of the trial, to test the reservations with which the Court, after denying General Motors' motions for a mistrial, and, for a directed verdict under Rule 50(a), Fed.Rules Civ.Proc., submitted the issues to a jury under Rule 50(b), Fed. Rules Civ.Proc.

Further examination of the record has confirmed the view of the Court that the evidence on the issues of liability and damages is wholly insufficient, or at least so insubstantial and lacking in probative value that there is no evidence whatsoever from which the jury might rationally have concluded that defendant General Motors had violated the federal statutes in question or

breached its contract with plaintiff or otherwise injured the business of plaintiff; that General Motors' motion for a directed verdict in its favor should be, and is, hereby ordered with the alternative provision that in the event such order should be vacated or reversed on appeal, the order for a new trial of the issues, unless also vacated or reversed on appeal, shall remain in effect. (See Rule 50(b) and (c) Fed.Rules Civ.Proc.).

 The Court is fully mindful that the test for the propriety of judgment notwithstanding the verdict is precisely the same as that which governs a motion for directed verdict "since the motion for judgment notwithstanding the verdict merely renews an earlier motion for a directed verdict," Minton v. Southern Railway Co., 368 F.2d 719, 720 (6th Cir. 1966). The test is whether in this case, considering the evidence in its most favorable light for plaintiff and giving to plaintiff's evidence all the fair value to which it is reasonably entitled and indulging every reasonable inference favorable to plaintiff, there is evidence of sufficient substantiality and probative value from which the jury might rationally find a verdict in favor of plaintiff. Moore's Federal Practice § 50.07, pp. 2356–2357; Wright & Miller Practice & Procedure § 2524; Massey v. F. H. McGraw & Co., 233 F.2d 905 (6th Cir. 1956).

 The verdict of a jury should not be lightly set aside, nor should a new trial be lightly granted—certainly not for the mere reason that the Court may disagree with the verdict. However, in this case the Court is convinced that this verdict for the plaintiff, if allowed to stand, would be a legally unjustified windfall to the plaintiff and a miscarriage of justice. Plaintiff cannot go to the jury on the basis of speculation, surmise or conjecture. Dayton Veneer & Lumber Mills v. Cincinnati, N.O. & T.P. Ry. Co., 132 F.2d 222, 223 (6th Cir. 1942); Wolfe v. National Lead Company, 225 F.2d 427, 433–434 (9th

Cir. 1955). It also must be remembered that forced or violent inferences may not be drawn and that an inference is a permissible deduction only when it may be reached by logic or reason. An inference results from and depends upon the process of reasoning and it cannot be invoked on the basis of speculation and conjecture. First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 284–290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); Galloway v. United States, 319 U.S. 372, 395, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943); Daily Press, Inc. v. United Press International, 412 F.2d 126, 133 (6th Cir. 1969), cert. denied, 396 U.S. 990, 90 S.Ct. 480, 24 L.Ed.2d 453 (1969).

In fairness to the jury, the Court notes that the length of the trial, the numerous exhibits, the technical, complicated subjects, and various specious considerations contributed to a jury verdict which is legally impermissible. However, the law is designed so that in such circumstances the Court must measure up to its responsibility and act in accordance with its considered evaluation of the record.

### THE PARTIES

From 1957 to January 19, 1966, Cecil Corley, Jr. operated an automobile dealership in Gallatin, Tennessee (about 30 miles from Nashville) as a sole proprietorship, under franchise agreements issued separately from time to time by Oldsmobile, Pontiac and GMC Truck divisions of General Motors Corporation, and by American Motors Corporation. On January 19, 1966, Cecil Corley, Jr., caused the business to be incorporated as Cecil Corley Motor Company, Inc., and this corporation continued to operate as an American Motors dealer until sometime in 1967, when it voluntarily terminated its contract with American Motors Corporation, and as an Oldsmobile, Pontiac and GMC Truck dealer of General Motors until April 1, 1970, when it again voluntarily terminated its contracts with General Motors, sold its as-

sets, and went out of the automobile business.[1]

Cecil Corley, Jr. had discussed incorporation with General Motors in 1965, requesting that the existing Franchise Agreements be terminated and that new Agreements be executed with the proposed corporation.. Pontiac Motor Division of General Motors would not agree to the granting of an Agreement to the proposed corporation unless Cecil Corley, Jr. executed a general release in Pontiac's favor. Before trial, Cecil Corley, Jr., having admitted to executing a general release (except for antitrust claims) in favor of Pontiac Motor Division as consideration for the granting of an Agreement to the plaintiff corporation,[2] this Court granted General Motors' motion for partial summary judgment with respect to any breach of contract claims asserted by the individual plaintiff, Cecil Corley, Jr.

From 1948 until October 1968, defendant, Paul Porter, was a partner with his father, B. A. Porter, in a Pontiac dealership known as Broadway Motor Company in Hartsville, Tennessee, some 16 miles northeast of Gallatin and 45 miles northeast of Nashville. (B. A. Porter had obtained his first Agreement with Pontiac at Hartsville in 1935.) In October 1968, Broadway Motor Company terminated its Dealer Selling Agreement with Pontiac Motor Division and moved to Lebanon, Tennessee. A new entity, Porter-Pontiac, Inc. obtained Pontiac and GMC Truck Franchise Agreements for Lebanon in October 1968.

Defendant Pontiac Motor Division is an automobile manufacturer engaged in the manufacture and sale of Pontiac automobiles and other products in interstate commerce throughout the United States, including the Middle District of Tennessee.

The Court notes that the only defendants in this litigation were Pontiac Motor Division and Paul Porter. Plaintiff corporation expressly disclaimed that any acts of Porter-Pontiac, Inc. had caused it injury or that any conspiracy had existed between Porter-Pontiac, Inc. and Pontiac Motor Division.[3] Further, the evidence was unequivocal that plaintiff corporation neither sought nor claimed damages for any acts of either Oldsmobile or GMC Truck Division of General Motors.[4] The evidence was also undisputed that some six months after plaintiff corporation commenced the instant litigation, it executed a full and complete release of any and all claims in favor of Oldsmobile Division of General Motors.[5]

### THE PONTIAC AGREEMENT

The Agreement between Cecil Corley Motor Company, Inc. and Pontiac Motor Division is identical in form with that of all Pontiac dealers in the United States, including Broadway Motor Company, with minor exceptions, such as the designation of the area of sales and service responsibility. The Agreement is entitled "Pontiac Dealer Selling Agreement", and consists of (1) the Dealer Sales Agreement, a three-page document containing the general purposes, considerations and parties; (2) a booklet containing Additional Provisions which are incorporated by reference in the Agreement; and (3) other addenda incorporated by reference.[6]

■ The Agreement is an integrated contract which meticulously spells out the rights and obligations of the parties and includes in Section 26 a provision

---

1. Opening Statement of plaintiff's counsel, Tr., p. 5; Corley Tr., pp. 16–17. Plaintiff relinquished the American Motors franchise because it had become unprofitable. Corley Tr., pp. 17; 411; 933–34; Hayes Tr., p. 477.

2. Tr., pp. 2–3, October 9, 1973 hearing. Exhibit HHHHH.

3. Corley Tr., pp. 951; 970; 1010; 1112; 1380–85.

4. Corley Tr., pp. 33; 231–36; 406; 896; 1102; 1167; 1192. Hayes Tr., pp. 517–18.

5. Exhibit IIIII.

6. Exhibits 4–6 and 11–12.

for a strict enforcement of the parol evidence rule. Similar contracts have been held to be integrated contracts and not subject to parol modification. See, e. g., Victory Motors of Savannah, Inc. v. Chrysler Motors Corp., 357 F.2d 429, 431 (5th Cir. 1966); Globe Motors, Inc. v. Studebaker-Packard Corporation, 328 F.2d 645, 649 (3rd Cir. 1964). Moreover, in Tennessee the parol evidence rule is a rule of substantive law, United States ex rel T.V.A. v. Easement, etc., 271 F.Supp. 55 (E.D.Tenn.1966); Cummings & Co. v. Mascari, 55 Tenn.App. 512, 402 S.W.2d 719 (W.S.1965); Marron v. Scarbrough, 44 Tenn.App. 414, 314 S.W.2d 165 (W.S.1958), which clearly prevents the introduction of parol evidence that would contradict the terms of a written contract. Clayton v. Haury, 224 Tenn. 222, 452 S.W.2d 865 (1970); Livingston v. Livingston, 58 Tenn.App. 271, 429 S.W.2d 452 (W.S.1967); Patterson v. Anderson Motor Co., 45 Tenn. App. 35, 319 S.W.2d 492 (W.S.1959); Marron v. Scarbrough, *supra*. Thus, this case is to be approached from the written language of the Agreement.

Under these agreements, Pontiac grants to the dealer the non-exclusive right to purchase, sell and advertise new Pontiacs and parts.[7] Plaintiff's witnesses acknowledge that Pontiac dealers were free to advertise and to sell at any price, and did so. Pontiac exercised no control over a dealer's resale prices. A dealer's customer could purchase his car at whatever price he could negotiate. Pontiac dealers were also completely free to sell to anyone, anywhere, and did so. There was no geographical barrier —neither territorial confinement, territorial security nor territorial exclusivity. "Cross-selling" by dealers without regard to the described area of sales responsibility was common. A Pontiac dealer could send his salesmen to scour for sales anywhere and sell to a customer wherever he could find one. No class of customers was excluded.[8] See, United States v. General Motors, 384 U. S. 127, 130, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966).

There is no provision in the Agreement requiring a dealer to order or accept any specified quantities, types or models of Pontiac vehicles, nor any obligation on the part of Pontiac Motor Division to deliver any such specified quantities. *Cf.* Augusta Rambler Sales, Inc. v. American Motors Sales Corp., 213 F.Supp. 889, 893 (N.D.Ga.1963). Section 3C of the Agreement, however, imposed a requirement that the dealer submit written orders for cars before Pontiac Motor Division would ship them. Plaintiff's own evidence established this to be true.[9] Plaintiff's witnesses further acknowledged that the Agreement neither contained any express provisions as to the day-to-day method to be used by Pontiac in the distribution of new cars, nor any stipulation that such distribution would be on the basis of either population, personal income, "fair share," or registrations in a dealer's area of sales and service responsibility, or any other method.[10]

## JURY VERDICT

The jury's verdict in favor of plaintiff corporation was: (1) that Pontiac Motor Division had breached its Agreement for which plaintiff was entitled to an award in compensatory damages of $189,000 and punitive damages of $189,000; (2) that Pontiac Motor Division had violated the Automobile Dealers Day in Court Act, 15 U.S.C. §§ 1221–1225, thereby causing damages of $50,000 to plaintiff; and (3) that Pontiac Motor Division had violated the Robinson-Patman Act, 15 U.S.C. § 13(e), by discriminating in the furnish-

---

7. Corley Tr., pp. 479–81; General Purpose Section and Sections 2B and 12B of the Agreement. See Corley Tr., pp. 596–97.

8. Corley Tr., pp. 428–30; 439–41; 448–51; 489–93; 718–19; 786; 851–55; 1043; 1174–78; Hayes Tr., p. 408.

9. Corley Tr., pp. 325; 499–500; 749–50; 753; 1161–63; 1276–77; Hayes Tr., pp. 209–11; 295; 416; 443.

10. Corley Tr., pp. 608–13; 710–11; 714; 717; 1205–06; Hayes Tr., pp. 260–69; 389–90; 392.

ing of services, and plaintiff was damaged in the amount of $25,000.

In substance, the jury verdict in favor of the defendants was: (1) that defendants Pontiac Motor Division and Paul Porter had not violated the Sherman Act, 15 U.S.C. § 2, by combining or conspiring to monopolize or attempting to monopolize the trade and commerce of new automobiles in the Nashville trading area; (2) that Paul Porter had not induced nor procured a breach of Pontiac Motor Division's Agreement with plaintiff corporation; and (3) that Cecil Corley, Jr., the individual plaintiff, was barred from claiming under the antitrust laws because he voluntarily executed a full and complete release in favor of Pontiac Motor Division.

### SUMMARY OF EVIDENCE

The evidence developed in this case underscores the importance of the law's requirement that legal injury be proved and not simply assumed, for neither the testimony nor the documentary evidence in this record supported the jury verdict. Plaintiff introduced no basic dealership records in support of its contentions. Records of vehicle orders and preference lists submitted to Pontiac Motor Division and monthly distribution reports received from Pontiac were all destroyed or otherwise not available. The evidence is that destruction of important dealership records took place while plaintiff contemplated litigation and even after this litigation had commenced.[11] Certainly, Pontiac Motor Division cannot be penalized for plaintiff's destruction or failure to keep essential records. See Associated Press v. Taft-Ingalls Corp., 340 F.2d 753, 765–766 (6th Cir. 1965). This Court agrees with the Court in Woolner Theatres, Inc. v. Paramount Pictures Corp., 333 F.Supp. 658, 661 (E.D.La.1970) when it noted:

"It is inconceivable that those records would have been destroyed after the

suit was filed, or even after the decision was made to file the suit, if they would not indict plaintiffs."

Where the requisite evidentiary tests are lacking, such as in this case, because plaintiff destroyed its records (even after litigation commenced) or chose not to produce such records, "heed must be given to the burden of proof." Shapleigh v. Mier, 299 U.S. 468, 475, 57 S.Ct. 261, 264, 81 L.Ed. 355 (1937, Cardozo, J.). Plaintiff "must always produce all the evidence he can" and "the best available evidence." William Goldman Theatres, Inc. v. Loews, Inc., 69 F.Supp. 103, 106 (E.D. Pa.1946), aff'd per curiam, 164 F.2d 1021 (3rd Cir.), cert. denied, 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948); Riss & Co. v. Association of American Railroads, 190 F.Supp. 10, 18 (D.D.C.1960), aff'd, 112 U.S.App.D.C. 49, 299 F.2d 133, 136 (1962). The law requires that where a party attempts to show injury by reason of lost sales or profits, it must present direct evidence of such losses caused by the alleged unlawful conduct. Dantzler v. Dictograph Prods., Inc., 309 F.2d 326, 329 (4th Cir. 1962), cert. denied, 372 U.S. 970, 83 S. Ct. 1097, 10 L.Ed.2d 133 (1963); Herman Schwabe, Inc. v. United Shoe Mach. Corp., 297 F.2d 906, 913 (2d Cir.), cert. denied, 369 U.S. 865, 82 S.Ct. 1031, 8 L. Ed.2d 85 (1962); American Sea Green Slate Co. v. O'Halloran, 229 F. 77, 81 (2d Cir. 1915).

In the Court's opinion, plaintiff's evidence failed to even approach these standards. After careful re-examination of the evidentiary record, the Court has confirmed its belief, tentatively reached earlier, that there is no substantial evidence upon which a jury or court could support such a finding, and that the plaintiff did, indeed, go to the jury only on the basis of speculation, surmise or conjecture.

---

11. Corley Tr., pp. 404; 655–58; 855–60; 871–78; 953–54; 1026–28; 1115–17; 1148– 53; 1193–94; Hayes Tr., pp. 45–46; 225; 296; 465–70.

## I

### BREACH OF CONTRACT

As previously noted, the release of January 19, 1966, executed by the individual plaintiff, effectively barred all claims for breach of contract prior to that date; *consequently, the breach of contract issue as submitted to the jury dealt only with the corporate plaintiff, Cecil Corley Motor Company, Inc., and only with the Pontiac Agreement of January 19, 1966.*

 The plaintiff's contentions concerning breach of the Agreement were that in its area of sales responsibility Pontiac Motor Division had: (1) failed to create and maintain "product good will;" (2) failed to provide saleable motor vehicles, parts and accessories at "fair and competitive prices" and, in fact, had destroyed the "competitive price market" for such products; (3) failed to provide from available supply motor vehicles in quantities to meet plaintiff's requirements; and (4) failed to provide assistance and service to plaintiff in meeting its sales and service responsibilities. The Court shall consider each of these contentions seriatim.

### A. *Failure to Maintain Product Good Will*

There is no proof in this record to sustain the contention that General Motors failed to maintain, or acted in any way to destroy, the product good will in plaintiff's area of sales responsibility. The Court turns to the written provisions of the Agreement of January 19, 1966, to determine the contractual obligations of the parties, and notes that the Agreement provided:

". . . that Pontiac will assist in creating a demand for such products by advertising in various advertising media; . . ."

And in Section 13 thereof:

"In order that Pontiac dealers may be assured the benefits of comprehensive advertising of Pontiac products, Pontiac agrees to establish, pay for, and maintain advertising and promotional programs to promote the sale of Pontiac products for the mutual benefit of Pontiac and Pontiac dealers and to administer such programs on a national and local basis."

There is no evidence in this record that these contract provisions were breached by Pontiac Motor Division. To the contrary, plaintiff's own witnesses clearly demonstrated that Pontiac had fulfilled its obligations under those provisions of the Agreement.

Plaintiff's expert conceded that Pontiac vehicles enjoyed good public acceptance, that during the 1960's, Pontiac was a "really hot car" in great demand by dealers and consumers, and that GM "externally" had created a demand for the Pontiac line.[12] No witness gave any testimony concerning any alleged adverse reputation of Pontiac products. Nor was any attempt made to show that lack of advertising by Pontiac Motor Division had caused plaintiff to experience a loss of sales, or greater advertising expenditures, or to have suffered damages. Accordingly, plaintiff's contention in this regard is not supported by the record.

### B. *Destruction of the Price Market*

The essence of this contention, consisting of two parts, was that Pontiac Motor Division had: (1) failed to provide plaintiff with products at "fair and competitive" prices, and (2) failed to maintain, and, by its actions destroyed the "competitive price market" for those products in plaintiff's area of sales responsibility.

There is no evidence from which the jury could rationally infer that Pontiac Motor Division had sold products to plaintiff other than at "fair and competitive" prices. In this context, plaintiff did not define nor attempt to define what it meant by Pontiac Motor Divi-

---

12. Professor Wm. Leonard's testimony, Tr., pp. 131–137.

sion's failure to furnish vehicles at "fair and competitive" prices.[13] There is no evidence that the fair value of Pontiac vehicles was other than as reflected by the prices paid for those vehicles by plaintiff. There is no evidence that the prices charged by Pontiac Motor Division for its vehicles were not competitive with the prices charged by other automobile manufacturers for similar vehicles. There is no evidence that plaintiff paid any more to Pontiac Motor Division for its automobiles than any other Pontiac dealer in the country.

On the contrary, the evidence is wholly to the effect that Pontiac vehicles were highly merchandisable and desirable products and that Pontiac Motor Division had sold new vehicles to plaintiff at the same prices charged to all other Pontiac dealers. Further, plaintiff's own witnesses testified that they had no evidence that any Pontiac dealer had ever purchased a Pontiac vehicle, part or accessory at a price other than the same price that was charged by Pontiac to the plaintiff.[14] Plaintiff was unable to introduce any evidence of the actual price which it paid for a single model Pontiac automobile, part or accessory, much less testimony that such purchases were not made at "fair or competitive" prices. The evidence is also to the effect that plaintiff made "fair" profits on the sale of its Pontiacs and claimed to have sold them for higher prices than did defendant Paul Porter.[15]

With respect to the second part of this contention, there is no evidence from which a jury could rationally infer that Pontiac Motor Division had failed to maintain, or by its actions, had destroyed the competitive price market. This contention, in any event, is legally untenable. As admitted by plaintiff, there is no provision in the Agreement obligating or imposing any duty upon Pontiac Motor Division to assist plaintiff in maintaining any price at which it could sell its products in its area.[16] For this reason, Pontiac Motor Division could not have breached any of the written provisions of its Agreement with plaintiff and, therefore, this contention is without legal foundation.

On the contrary, the evidence is wholly to the effect that Pontiac Motor Division neither had the right to control, nor even any say, as to where a dealer sold his automobiles or the prices at which he chose to sell them.[17] Indeed, plaintiff's evidence is that Pontiac Motor Division had never participated with any dealer in the fixing or the setting of the resale price of a single automobile.[18]

██ This total absence of proof that Pontiac Motor Division had failed to comply with one of the written terms of the Agreement is, therefore, sufficient to dispose of this contention. Moreover, even if the Agreement had provided that Pontiac Motor Division would assist a dealer in maintaining a certain competitive price level, or had Pontiac Motor Division undertaken to maintain resale prices at any level, in this Court's opinion this would have been a *per se* violation of the antitrust laws. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1948); United States v. Nat'l Ass'n of Real Estate Boards, 339 U.S. 485, 70 S. Ct. 711, 94 L.Ed. 1007 (1950).

The Court feels compelled to set out what it believes to be the legally untenable contentions advanced by plaintiff during the course of the trial. The evidence is that plaintiff sought to maximize revenues and obtain the highest profits possible on each new vehicle

---

13. Plaintiff's counsel even objected to Cecil Corley, Jr. being cross-examined as to what "competitive prices" meant because he didn't know the meaning to be attached to that term. Corley Tr., p. 686.

14. Corley Tr., pp. 125–126; Leonard Tr., pp. 285–86; Hayes Tr., p. 267.

15. Corley Tr., pp. 183–84; 1068; Hayes Tr., pp. 473–74; Leonard Tr., pp. 242–43.

16. Corley Tr., p. 689.

17. Corley Tr., pp. 1256; 1261–64; Fn. 8, *supra*.

18. Corley Tr., pp. 718–19.

sale.[19] Certainly, as it was candidly expressed by its President, Cecil Corley, Jr.,[20] the plaintiff was free to get the top dollar out of every car sold, just as any other Pontiac dealer, including Paul Porter, was free to sell for less or even more. The evidence is also that plaintiff made "fair profits" on the sale of its new Pontiacs and that its gross profit margins were comparable to those of Paul Porter. Although plaintiff claimed to have a reputation for selling new Pontiacs at higher prices than did Paul Porter, it presented no other credible evidence on this point.[21]

■ Contrary to plaintiff's claim, it may not impose on Pontiac Motor Division an obligation to assist it in exacting from consumers whatever prices it may want. The evidence is that plaintiff wanted Pontiac Motor Division to ship to competing dealers new vehicles sufficient only to meet their market requirements in their area of sales responsibility, based primarily on new car registration figures, and that Pontiac Motor Division should not allow dealers, such as Paul Porter, to sell a substantial number of new Pontiacs in plaintiff's area because it was making "shoppers" out of the residents in its area.[22] Plaintiff disliked matching wits with aggressive price-conscious shoppers who could "buy it for less a few miles down the road,"[23] and the evidence is also to the effect that plaintiff sought, by threat of litigation, to have Pontiac Motor Division take steps to eliminate the "cross-selling," "undercutting" of prices, and advertising of new Pontiacs by Paul Porter in plaintiff's area.[24]

Plaintiff's witnesses even contended that Pontiac Motor Division should not only have restricted the shipment of new vehicles to Paul Porter, who obviously was "cutting into the sales" made by plaintiff, but that it should have applied sanctions.[25]

■ The law is clear that resale price maintenance or territorial restrictions or attempts to do so are "conclusively presumed to be unreasonable and illegal without elaborate inquiry as to the precise harm they have caused . . . ." United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 210, 60 S.Ct. 811, 84 L.Ed. 1129 (1948); Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); Simpson v. Union Oil Co. of California, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944); United States v. Arnold, Schwinn, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

■ When a supplier goes beyond a mere announcement of suggested resale price policy and enlists an agreement by the retailer to adhere to a price at which it will resell the products that it buys, then the seller has put together a combination in violation of Section 1 of the Sherman Act. United States v. Parke-Davis and Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). It follows that efforts by a supplier to help a dealer ex-

---

19. Hayes Tr., p. 422–23.

20. As Cecil Corley stated at Tr., pp. 409–10: "Q. Isn't it your philosophy and hasn't it been your consistent philosophy throughout your history in the automobile business that you're supposed to get the top dollar out of every car? A. Well, I think any businessman would be a fool to leave money laying on the table if he could get it. Charity belongs to the Church, to your momma."

21. Corley Tr., pp. 183; 704–09; 1001–05; 1107–08; 1328; Hayes Tr., pp. 395; 473–74; Exhibit 71 and FFFF; Answers to Request to Admit.

22. Corley Tr., pp. 80; 430; 435; 479–83; 487; 564–65; 574–75; 701–02; 788–804; 980. Exhibits H, AA, CC, UUUU, VVVV, WWWW, YYYY, ZZZZ.

23. Exhibit W; Corley Tr., pp. 482–83; 493; 574–77.

24. Corley Tr., pp. 387; 430; 435; 438–39; 471; 479–81; 493; 564–65; 575; 599–607; 626–28; 685–708; 788–93; 801–04; 862; 980; 1236; 1391–93; Hayes Tr., pp. 264–66; 272–73.

25. Professor Leonard Tr., pp. 227–31.

act certain resale prices from customers would also be unlawful. See, Albrecht v. Herald Co., *supra*; United States v. General Motors, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966).

It also follows that Pontiac Motor Division could not limit the shipments of vehicles, nor apply sanctions, to Paul Porter in order to cause him to stop advertising or selling in plaintiff's area, because this would be tantamount to an agreement not to compete and would be a *per se* violation of the Sherman Act. United States v. House of Seagrams, Inc., 1965 Trade Cases, ¶ 71,517 (D.Fla.1965); United States v. Toy Guidance Council, Inc., 1957 Trade Cases, ¶ 68,831 (D.C.N.Y.1957). See also: United States v. Gasoline Retailers Ass'n, Inc., 285 F.2d 688 (7th Cir. 1961); Plymouth Dealers' Ass'n of Northern California v. United States, 279 F.2d 128 (9th Cir. 1960).

Moreover, any attempt by this plaintiff and by Paul Porter to agree on areas of sales responsibility, through the intervention of Pontiac Motor Division or any other means, would constitute an attempt to divide the market and eliminate competition between the dealers and would similarly be a *per se* violation of the Sherman Act. United States v. Topco Associates, Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); United States v. Arnold, Schwinn Co., supra; United States v. General Motors, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); Hobart Brothers Company v. Malcom T. Gilliland, Inc., 471 F.2d 894 (5th Cir. 1973); American Motor Inns v. Holiday Inns, 365 F.Supp. 1073 (D.N.J.1973).

Plaintiff sought to avoid the clear implications of its attempts to solicit Pontiac Motor Division's engagement in unlawful activity by contending that Paul Porter was undercutting

prices and selling from 50% to 80% of his new vehicles outside his area, and insisted that Pontiac Motor Division was required to prevent that activity. No such obligation can be construed from the Agreement, nor can it be found in law. Keen rivalry and unfettered price competition are the essence of competition which the Sherman Act was designed to promote.

Plaintiff itself admitted that had Pontiac Motor Division limited the number of vehicles shipped into any area, this would have lent aid in supporting a high retail price for the dealer and, further, had Pontiac Motor Division done so at the urging of the dealer, the result would have amounted to illegal price-fixing.[26] Furthermore, plaintiff's Vice President made it clear that Pontiac Motor Division was expected to confine Paul Porter's major selling efforts to his own area so that plaintiff could preserve a "competitive" price in its area.[27]

Plaintiff cannot recover damages from General Motors for its failure to take action which it was not contractually obligated to take and which, if undertaken, would have constituted a clear and obvious violation of the Sherman Act.

C. *Insufficient Product Availability*

*Again, the Court observes that one must keep in mind that we are dealing with the period of January 19, 1966 and forward, and that any contentions prior to that date do not affect Cecil Corley Motor Company, Inc., which was not in existence.* Additionally, the dealer who allegedly might have been affected by any activity prior to January 19, 1966, Cecil Corley, Jr., had come to an amicable accord with General Motors and had executed the heretofore mentioned release. With full knowledge of the

---

26. Corley Tr., pp. 686–693.

27. Hayes Tr., pp. 264–66; 270–73. The record showed that Paul Porter made 25% of his Pontiac sales in plaintiff's area. But

Pontiac could not refuse to fill Porter's orders without violating the Sherman Act and even the Dealer Act. See House Report No. 2850 (p. 10) 1956, 84th Cong.2d Sess.

terms and conditions of the Agreement, the market as it then existed, its history and its condition, Cecil Corley Motor Company, Inc. took the market as it was when it applied for and received a new Agreement to sell Pontiac automobiles. Plaintiff's President admitted familiarity not only with the terms and conditions of the 1966 Agreement, but also with the prior substantially identical Agreements he had entered into, from time to time, with Pontiac Motor Division.

■ There is no evidence from which a jury could rationally infer that Pontiac Motor Division had failed to make products available to plaintiff "in quantities to meet Dealer's reasonable requirements in Dealer's area of sales responsibility." To the contrary, the evidence establishes that Pontiac Motor Division had fulfilled its obligations under this provision of the Agreement.

Since plaintiff's own witnesses admitted that from the period beginning at least as early as April 1967, until the voluntary termination of the Agreement, the plaintiff corporation had been supplied with *all* of the Pontiac vehicles that it had wanted and that it could sell,[28] it follows that plaintiff's contention of alleged product insufficiency narrowed down to the period from January 19, 1966 to April 1967.

Thus, to sustain its contention as to this 14 to 15 month period, plaintiff had to prove three things: (1) that it actually ordered more vehicles than it received from Pontiac Motor Division; (2) that the particular model vehicles ordered, but not supplied, were available for delivery, i. e., there was no product shortage at the time, or if there existed a period of product shortage such as was customary in the business during the months of new model introduction (October–December 1966), that Pontiac Motor Division failed to allocate vehicles in a fair and reasonable manner;[29] and (3) that Pontiac failed to make such vehicles available for the "reasonable requirements" of plaintiff's area of sales responsibility.

Plaintiff has not even met its threshold burden. There is no evidence from which the jury could rationally infer that Pontiac Motor Division had failed to supply plaintiff with all the vehicles it had ordered.

■ Viewing the evidence in the light most favorable to plaintiff, the facts are that between January 19, 1966 to April 1967, Paul Porter received approximately twice the number of Pontiacs that plaintiff received. However, plaintiff's own evidence is wholly to the effect that plaintiff never received vehicles unless they were first ordered and that Pontiac Motor Division required submission of such orders before vehicles would be shipped.[30] See: Staten Island v. American Motors Sales, 169 F.Supp. 378, 380–381 (D.N.J.1959). Plaintiff made no attempt to show that even a single vehicle order had not been supplied,[31] and plaintiff's counsel even conceded that plaintiff was not contending that Pontiac Motor Division had failed to supply vehicles as ordered, for it had no such evidence, but did contend that some of the orders had not been filled in a timely manner.[32] Even after this admission, plaintiff was unsuccessful in presenting any proof to justify

28. Corley Tr., pp. 139; 325; 499–500; 749–50; 753; 1161–63; 1276–77; Hayes Tr., pp. 209–11; 295; 418; 443. In response to a question from the Court, Mr. Hayes conceded that it did not make any difference in 1967, 1968 or 1969 whether other Pontiac dealers got more cars than plaintiff, because plaintiff got all it could sell. Hayes Tr., pp. 210–11.

29. Uniform Commercial Code; Michigan Code § 19.2615(a) & (b), M.C.L.A. § 440.-2615(a) & (b); T.C.A. § 47–2–615(a) & (b).

30. Section 3C of the Agreement; Financial Statements, Exhibits 71 and FFFF.

31. Hayes Tr., pp. 209–13; 295; Corley Tr., pp. 871–78; 1126–27; 1255; 1265.

32. Corley Tr., pp. 1123–26.

this fallback contention. Thus, it is clear from this record that plaintiff had to first order the vehicles before Pontiac Motor Division could supply them, and that Pontiac had fulfilled its part of the bargain.[33]

Plaintiff's own evidence is also that plaintiff was unable to concentrate its full efforts on the Pontiac line of vehicles, as had Paul Porter, because of its divided interest in handling four franchised lines of vehicles.[34] Further, plaintiff's evidence showed that it (and its predecessor) experienced difficulties in operating a four franchise dealership because it was substantially undercapitalized and suffered from frequent cash shortages. These problems caused plaintiff difficulty in maintaining a sufficient inventory of different models of new vehicles; credit limitations also had a bearing on the number of new vehicles in inventory at any given time.[35] Plaintiff's Vice President admitted that the financing institution which did the floor-planning for its new vehicles had, from time to time, pointed out to plaintiff when it had too large an inventory.[36]

No evidence was introduced at all concerning the number, kind, model and color of new Pontiac vehicles actually ordered at any time. Nor was there any evidence concerning the availability of any car ordered by plaintiff, nor that cars were ordered, but were not delivered or were unreasonably delayed although available. No attempt was made to prove even a single instance where plaintiff wanted and ordered a particular automobile which Pontiac had available and which it had refused to supply. To the contrary, as noted previously, plaintiff's witnesses testified that they had no specific proof of a single order which had not been filled by Pontiac. Moreover, there is no evidence from which a jury could rationally infer that plaintiff was ever supplied with unwanted or unordered vehicles. On the contrary, plaintiff testified that it never received any Pontiac vehicles unless it had ordered them of its own free will.[37]

The evidence above summarized is wholly to the effect that plaintiff failed to introduce evidence of even one single occasion that an automobile of a specific model number, color and accessories was ordered and had not been shipped or ordered but unreasonably delayed in shipment by Pontiac.

Since there is no evidence that Pontiac Motor Division had failed to fill plaintiff's orders nor that it had furnished plaintiff with unwanted automobiles, it follows that the jury could not rationally have inferred that Pontiac

33. The Court observes that apparently one of the reasons for the enactment of the Automobile Franchise Dealer Act, 15 U.S.C. § 1221 et seq., was to prohibit automobile manufacturers from shipping cars to dealers unless they were first ordered by the dealers.

34. Hayes Tr., p. 516. Between January 19, 1966 to April 1967, plaintiff's total number of new vehicle sales of all brands of vehicles (Oldsmobile, Pontiac, etc.) equalled or were greater than the number of new Pontiacs sold by Paul Porter.

35. Exhibits EE; FF; GG; HII; II; JJ; LLL. Corley Tr., pp. 514; 573-77; 720-21; 731-32; 739-49; 760-80; 1460-65; 1471-72. Hayes Tr., pp. 278-85; 400-01.

36. Hayes Tr., p. 433, Corley Tr., pp. 881-86; 1408-12. The evidence is clear that, whether because of financial problems or whatever, plaintiff did not choose to order cars which were readily available. Plaintiff was selective in the types of models it would order for it wanted "hot" models or the "cream of the crop" and it would decline to purchase other models offered to it. Hayes Tr., pp. 413-16. Further during the second half of the model year (March–July) when plaintiff could order nearly all the cars it wanted, it declined to purchase all the automobiles which were made available by Pontiac. Hayes Tr., p. 440; Corley Tr., pp. 125-26; 308; 1161-62. Thus, to the extent that there is any evidence in the record regarding the ordering of cars, it reflects that plaintiff did not purchase cars which had been made available to it. Additionally, there was evidence from time to time that plaintiff cancelled orders for new Pontiacs because it didn't need them and did not have sufficient credit. Corley Tr., pp. 307; 646-67; 881-887; 1408-12.

37. Corley Tr., pp. 449-500; 1255.

had not complied with its obligations in furnishing vehicles to meet plaintiff's "reasonable requirements" in its area of sales responsibility.

*There is no evidence presented by any person, plaintiff or its experts, as to what constituted "reasonable requirements" in plaintiff's area of sales responsibility.* Plaintiff's President, Cecil Corley, Jr., attempted to cure this deficiency by testifying about a vague, allegedly simple concept, which he admitted was not to be found in the franchise agreement, known as "fair share." He testified only that the reasonable requirements would be a "fair share," of the available new vehicles; i. e., enough vehicles to "take care of my area of sales responsibility" and a percentage of any oversupply.[38] He also testified that if another adjoining Pontiac dealer ordered and received vehicles above the "reasonable requirements" of his area of sales responsibility then he got "too many" cars, and that Pontiac Motor Division should have refused to fill orders which exceeded that dealer's "reasonable requirements." Thus, plaintiff equated the concept of "fair share" distribution with that of territorial limitation, and that Pontiac should have predetermined this distribution "figure" or the number of vehicles that a dealer should receive, and no more.[39] No such obligation is to be found in the Agreement nor the law.

This Court is unable to see any correlation between the distribution system used by Pontiac Motor Division as disclosed in this record and the so-called hypothetical concept of "fair share" distribution as proffered by plaintiff. However, in addition to not providing the jury nor this Court with any definitive figure representing the nebulous "fair share," plaintiff's own evidence established that its operations were geared for concentrated selling outside of its

own area of sales responsibility and that it not only attempted to sell, but actually did sell approximately 50% of the Pontiacs (as well as Oldsmobiles) that it had received outside of its own area.[40] Plaintiff could have, had it chosen to do so, sold each and every one of those Pontiacs in its own area of sales responsibility, as its own witness, Dr. Leonard, so testified.[41]. The evidence is also that while plaintiff was selling 50% of its Pontiacs outside its area of sales responsibility, competing Pontiac dealers were selling approximately 50% of the Pontiacs in plaintiff's area.[42] Therefore, the evidence is indeed that Pontiac Motor Division had actually supplied plaintiff with its "reasonable requirements," had it chosen to sell all of its cars in its own area of sales responsibility.

Plaintiff attempted to show that its "fair share" might be the number of new Pontiac vehicles registered in its area. However, it was conceded that registration figures did not purport to show, nor did they reflect where cars were sold, and by whom. The evidence was further clear that Pontiac Motor Division did not restrict dealer sales to their own areas of sales responsibility. Certainly, the evidence and the testimony of plaintiff's own witnesses were to the effect that cross-selling was an accepted and prevalent practice, not only in plaintiff's area of Sumner County, but throughout the entire Nashville trading area covering several counties. Sumner County borders Davidson County and the clear implication from the record was that many people in Sumner County worked in Davidson County. No evidence was offered as to the number of Sumner County residents who might have bought their automobiles in Davidson County, or of the Davidson County residents who might have bought theirs in Sumner County, and so forth. It is

38. Corley Tr., pp. 1236; 1295.

39. Corley Tr., pp. 788–90; 801–05; 1236; 1261–64. As noted previously, the objections were to price competition, the "cross-selling" and advertising by Paul Porter in plaintiff's area.

40. Corley Tr., pp. 428–30; 439–41; 448–51; 490–93; 849–54; 1043; 1174–78; Hayes Tr., pp. 408–09; Leonard Tr., pp. 216–17.

41. Leonard Tr., pp. 223–27.

42. Exhibits F; TTT; UUU; VVV.

obvious that no rational inference could be drawn as to plaintiff's "fair share" on the basis of registration figures, since cross-selling effected the validity of those figures, and because registration figures admittedly did not show which dealer sold the car, nor the location of the selling dealership.

Professor Leonard, the plaintiff's expert, hypothetically compared the relative family income of residents in Sumner County with those in Broadway Motor Company's area.[43] He insisted, however, that this comparison was not to be interpreted as advocating that this was either a valid method of distributing automobiles or the system actually used by Pontiac, for he was unfamiliar with Pontiac's system of distribution.[44] However, "if" Pontiac distributed vehicles according to family income, then certain conclusions could be reached as to the "market potentials" of the two dealers. A party may not put forth a theory of automobile distribution which he himself does not advocate and which ignores the evidence in this record, such as the managerial strengths of the two dealerships, their financial resources, their marketing abilities and philosophies, as well as the legally accepted practice of cross-selling and the right of a consumer to purchase his Pontiac from any dealer that he chooses.[45] Plaintiff's expert virtually ignored the evidence that Pontiac's distribution was not based upon "family income," but on orders received and preferenced and dealer retail sales.

*A comparison of the so-called "market potential" of plaintiff's area of sales responsibility with only one of a number of adjoining and nearby areas of sales responsibility of any number of Pontiac dealers, furnishes no rational inference* *of the reasonable requirements in plaintiff's area any more than it does for establishing the reasonable requirements of those of Broadway Motor Company or of any other Pontiac dealer.* It is sheer speculation to suppose or contend, in this era of a highly mobile population and price-consciousness, that the distribution of any particular make of automobile is determinable on the basis of the "family income" of the people in an area, as if the people have no choice but to deal only with dealers in their area. To the contrary, the evidence is that people shop around for the best deal and that dealers engage in vigorous cross-selling.

Professor Leonard's theory sought to compare potential customers on the basis of their family income in relation to all brands of automobiles, but, on the other hand, plaintiff's contentions were only that Pontiac Motor Division had failed to fill its reasonable requirements. Plaintiff's failure to introduce the requisite evidentiary facts to show that Pontiac Motor Division had failed to deliver even a single vehicle as ordered is not cured by reference to a so-called market potential. The illogical leap from Professor Leonard's premise of potential customers on the basis of family income to plaintiff's "fair share" theory is but sheer surmise and speculation and contrary to the evidence.

*In a further attempt to substitute for the lack of requisite proof, plaintiff made a comparison between cars received by plaintiff and only one dealer in an adjoining area of sales responsibility.* Plaintiff did not contend that the adjoining dealer had not ordered those vehicles, nor did plaintiff offer any evidence that it had ordered more vehicles than it had received. Plaintiff asserted

---

43. Exhibits 74–77. Other than Cecil Corley, Jr.'s irritation with the price competition, cross-selling, and advertising by Broadway Motor into plaintiff's area, there appears to this Court to be no valid reason why all of plaintiff's comparisons singled out only this one dealer in one adjoining area instead of comparing plaintiff with all adjoining and nearby Pontiac dealers in their areas, which

would have seemed to be the much more reasonable logical approach.

44. Leonard Tr., pp. 9–10; 42; 172; 214–15; 348. Plaintiff's counsel also disclaimed Professor Leonard's theory as a method of distribution. Leonard Tr., p. 10.

45. Corley Tr., pp. 1232–34.

only that the adjoining dealer received more cars, and more desirable cars, allegedly quicker. However, even as to these fallback contentions, there was no evidence of such facts, even if pertinent.[46] There was a general opinion expressed by the President and chief stockholder of plaintiff, that as a result of driving by he noticed certain cars on Broadway Motor Company's lot. There was also hearsay evidence received from a few residents in plaintiff's area who purchased cars from the adjoining dealer.

It is significant that no comparisons were made by plaintiff showing the model, color, etc. of vehicles received by plaintiff and the adjoining dealer. It is also most significant to the Court that Paul Porter had made his records available to plaintiff, but plaintiff did not elect to examine them.[47] This is very important because the evidence was that Broadway Motor Company would trade for cars with other adjoining Pontiac dealers and would take all models and kinds of vehicles offered by Pontiac whereas plaintiff was selective in his ordering practices and concentrated on so-called "hot" cars.[48]

■ From the evidence summarized above, it is clear that plaintiff did not prove that Pontiac Motor Division had, in any way, failed to furnish vehicles to plaintiff to meet the dealer's requirement during the period of January 19, 1966 to April 1967, nor that Pontiac Motor Division had furnished Paul Porter with "too many" vehicles. The record is clear that distribution of Pontiac vehicles was not made on the basis of a deal-er's area or territory but on the basis of sales, and that cross-selling was a prevalent and accepted practice. *It is no breach of plaintiff's Agreement to merely show that one Pontiac dealer received a greater number of vehicles than did plaintiff;* this fact cannot rationally serve as a substitute for the missing requisite evidentiary proof.

Isolated figures and unadjusted comparisons cannot support the asserted preferences, and any illusions that they create are quickly dispelled by the evidence, for it appears that Paul Porter would trade with other Pontiac dealers for cars and would order most any type or kind of vehicle available whereas plaintiff was "selective" in the kinds of vehicles it would order. Additionally, plaintiff was handicapped in operating a multiple franchise dealership because of its financial problems whereas Paul Porter was adequately capitalized and operated only a Pontiac dealership.

There is no evidence from which the jury could rationally infer that the distribution system actually employed by Pontiac Motor Division was other than fair and reasonable, nor that it had not been fairly applied. Plaintiff offered no evidence in any way to contradict the method used by Pontiac Motor Division in distributing vehicles.

On the contrary, as part of plaintiff's case in chief, it placed in evidence exhibits demonstrating that distribution of new vehicles was made on the basis of retail sales made by the dealer, and that during periods of product shortage, Pontiac vehicles were distributed to dealers

46. Plaintiff Exhibit No. 18; Corley Tr., pp. 403–04; 658–60; 701–06; 869–78; 1001–05; 1108–09; 1148–53; 1266–67; 1328; Hayes Tr., pp. 407–08.

47. Corley Tr., pp. 659; 1001–05; 1107–08.

48. This was the only testimony in the record which even remotely suggested that plaintiff wanted more cars than Pontiac's available supply permitted. Cecil Corley testified that although plaintiff had received all of its sold orders of the "hot" models of Tempests and Catalinas in the Fall of 1966, it hadn't been able to obtain quantities of such models for stock (October–December, 1966), Tr., pp. 248–51; 300. But plaintiff conceded this was not unusual, for most Pontiac dealers wanted more new cars than what Pontiac could supply during periods of new model announcement, and that if it had ordered only "hot" cars, it couldn't expect that Pontiac would be in a position to supply all of them. Tr., pp. 501; 1326–28.

on an "earned share," based upon each dealer's prior sales history.[49]

During the early months of the new models (October–December), Pontiac Motor Division distributes its vehicles on the basis of past sales history, i. e., dealers receive a pro rata percentage of those units based upon their past sales so that the more vehicles a dealer sells the more units he will receive. The effect is to divide production among all dealers in a Zone, including plaintiff and Paul Porter, equitably and in a manner which maintains relative equality among all dealers. This principle has been recognized as reasonable and fair. See: Independent Iron Works, Inc. v. United States Steel Corp., 322 F.2d 656, 662, 668, 177 F.Supp. 743, 748–749 (9th Cir. 1963), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963); Banana Distributors v. United Fruit Co., D.C., 162 F.Supp. 32, 45, rev'd on other grounds, 269 F.2d 790 (2d Cir. 1957); Rogers v. Douglas Tobacco Board of Trade, 244 F.2d 471 (5th Cir. 1957); Dipson Theatres, Inc. v. Buffalo Theatres, Inc., 190 F.2d 951, 958–959 (2d Cir. 1951), cert. denied, 342 U.S. 926, 72 S. Ct. 363, 96 L.Ed. 691 (1952); Leach v. Ford Motor Company, 189 F.Supp. 349, 352 (D.C.Cal.1960).

The Pontiac Agreement provided that it was to be interpreted according to the laws of the State of Michigan. The Michigan Statutes Annotated, § 19.-2615(a) provides that:

"[where availability of an adequate supply is a] contingency, the non-occurrence of which was a basic assumption on which the contract was made . . ."

then a seller must make reasonable allocation of available supply among its customers, as the next Section, § 19.-2615(b) provides:

"Where the causes mentioned in paragraph (a) affect only a part of the seller's capacity to perform, *he must allocate production and deliveries among his customers* . . . He may so allocate in any manner which is fair and reasonable." (Emphasis supplied)

Thus, under Michigan law (or even if Tennessee law applied, for these identical provisions are part of the Tennessee Uniform Commercial Code T.C.A. § 47–2–615(a) and (b)), Pontiac had a duty, during periods of short supply, to allocate available production among its customers on a fair and reasonable basis. The evidence is that it did so. Plaintiff's own witnesses admitted that during the entire period of January 1966 to April of 1967 Pontiac had furnished it with a greater "days supply" [50] of Pontiacs than it had generally done with other dealers. In the months of January, February and April of 1966, plaintiff's days supply of Pontiacs was greater than all other Pontiac dealers in Middle Tennessee, and plaintiff's days supply was greater than that of Broadway Motor Company for seven months of 1966.[51]

Plaintiff's proof virtually ignored this fundamental requirement of proving product availability. As to this matter of product availability, one more fact is of major importance to the Court, not only in this context, but with regard to all of plaintiff's contract claims. *On January 19, 1966, when the*

49. Corley Tr., pp. 358–61; Exhibits 42–44. Hayes Tr., p. 255.

50. Days supply is the number of days a dealer can operate on his present inventory, based on his past 30 days rate of sales. If a dealer sells his cars more quickly than another dealer, his days supply will be less and the other's higher. Plaintiff's Vice President, Glenn Hayes, admitted that Pontiac Motor Division's computation of days supply was an accepted and generally accurate method. Hayes Tr., pp. 330–45.

51. As part of plaintiff's case in chief, Cecil Corley, Jr. admitted that plaintiff's "days supply" during May–September 1966 and January–March 1967 was equal to or had exceeded the average of those for Pontiac dealers in Middle Tennessee. Tr. pp. 295–300. He endeavored to explain away the high days supply of Pontiacs during January–March 1967 on the basis that those were the slowest selling months plaintiff had in business. Tr. p. 300.

*plaintiff came into existence, it knew through its officers and directors the history and practices of Pontiac Motor Division's system of distribution.* It knew that its president, Cecil Corley, Jr., had vigorously attacked and opposed that system. It knew that Mr. Corley contended and continued to assert that the Pontiac market in its area of sales responsibility had been materially impaired by alleged discrimination in product availability resulting in alleged destruction of price stability. However, despite this knowledge and without any alleged additional inquiry as to the system used by Pontiac, the corporation solicited and obtained a franchise to sell Pontiacs. It is this Court's view that because of the long history and experience of the president and the sole stockholder of plaintiff corporation with Pontiac prior to the acquisition of this franchise, that this corporation took the established Pontiac distribution system as it found it. If it desired a different system it could have attempted to negotiate to effect same. Of course, any antitrust claim or complaint that Cecil Corley, Jr., might have had against Pontiac, or concerning its distribution system, was obviously, as found by the jury, released by the January 19, 1966 release.

### D. *Lack of Assistance and Service*

There is no evidence from which a jury could rationally infer that Pontiac had failed to assist plaintiff in meeting its sales and service responsibilities.

On the contrary, the evidence is that Pontiac Motor Division not only cooperated but on numerous occasions responded to plaintiff's criticisms with personal visits of its top officials from the Central, Regional and Zone offices and even by personal visits and telephone contacts from the Director of Dealer Relations of General Motors Corporation in Detroit.[52]

There is no evidence that Pontiac Motor Division had in any way failed to provide the assistance required. Nor is there any evidence that plaintiff suffered any pecuniary loss because of such alleged failures on the part of Pontiac Motor Division.

After careful and detailed re-examination of this record, the Court has confirmed its tentative view reached earlier, that there is total failure of proof regarding plaintiff's contention that General Motors had breached its contract. Obviously, since the jury's award of punitive damages was predicated upon the breach of contract verdict, this award also must fail.

However, the Court notes its grave reservations regarding the legal propriety of an award of punitive damages, as they are generally not recoverable for breach of contract, either under Tennessee law, Bland v. Smith, 197 Tenn. 683, 277 S.W.2d 377 (1954); McDonald v. Stone, 45 Tenn.App. 172, 321 S.W.2d 845 (1959); Booth v. Kirk, 53 Tenn.App. 139, 381 S.W.2d 312 (1963); or, under Michigan law, Caradonna v. Thorious, 17 Mich.App. 41, 169 N.W.2d 179 (1969); Oppenhuizen v. Wennersten, 2 Mich.App. 288, 139 N.W. 2d 765 (1966). Additionally, and also obviously, this is not the situation where any exception to the above general rule should be applied, for there is no evidence of fraud, malice, gross negligence or oppression to sustain the award of punitive damages.

### E. *Plaintiff's "Destruction of the Market" Theory*

The major portion of the evidence introduced by the plaintiff in an attempt to show discrimination in availability of Pontiac products and the destruction of price stability in plaintiff's area of sales responsibility dealt with the period prior to January 19, 1966. Again it is to be

---

52. These included T. L. King, General Sales Manager; R. E. Thompson and T. L. Merriwether, Assistant General Sales Managers; L. H. Holmes and H. N. Long, Regional Managers; M. H. Cole, Zone Manager; and W. R. Stacy, Director of Dealer Relations.

noted that plaintiff came into existence on January 19, 1966.

Plaintiff's predecessor claimed that the "area of sales responsibility" which plaintiff later acquired had been allegedly destroyed with regard to price stability due to the practices of the defendant Pontiac in concert with the defendant Porter. A number of theories were advanced. The major item, however, was the alleged participation of Pontiac in a scheme which had the effect of using a dealer (Broadway Motor Company) as a so-called "stimulator dealer" in an adjoining area of sales responsibility. This was accomplished, according to plaintiff, by General Motors delivering to the alleged stimulator dealer more cars than his area justified, thus permitting him to sell his excess cars in plaintiff's area of sales responsibility, at a price which was less than that at which plaintiff or plaintiff's predecessor chose to sell the same product. Plaintiff asserted that in this manner the defendant General Motors, in effect, either set prices or destroyed price stability.

To place this contention in perspective, the following facts are found by this Court to be controlling:

(1) The jury found that there was no conspiracy between General Motors and Paul Porter and found no wrongful conduct whatever by Paul Porter.

(2) The jury found that any alleged wrong committed by the defendant General Motors, which occurred prior to January 19, 1966, was released by plaintiff's predecessor.

(3) There is not one iota of evidence in the record that any alleged wrongful acts of General Motors occurred or continued after January 19, 1966.

(4) There is not one iota of evidence in the record that any act by General Motors affected the price structure or price stability in plaintiff's area of sales responsibility after January 19, 1966.

(5) There is not one iota of evidence in the record that General Motors treat-ed the plaintiff, from January 19, 1966 and forward, in any manner different from the manner in which General Motors treated any other new dealer or franchisee.

The Court will not repeat herein the various other infirmities in plaintiff's theories which are discussed in detail hereinbefore and hereafter.

 It is elementary that plaintiff's allegations, or any evidence of alleged past misconduct, concerning one dealer for which a release has already been obtained, is not proof of the existence of this conduct as to a successor dealer.

## II

## THE DEALER ACT

The plaintiff charged Pontiac Motor Division with a violation of the Automobile Dealers Day in Court Act, 15 U.S.C. § 1221, hereinafter referred to as "the Act" or "the Dealer Act." The Act provides that an automobile dealer may sue in Federal Court for the failure of a manufacturer:

> "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, cancelling, or not renewing the franchise with said dealer: Provided, that in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith." 15 U.S.C. § 1222

Plaintiff's claims concerning Pontiac's alleged violation of the Dealer Act closely paralleled its allegations concerning the alleged breach of contract.[53] Plaintiff charged that Pontiac failed to act in good faith with regard to (1) the distribution and availability of new Pontiac automobiles in plaintiff's area of sales responsibility; (2) the promotion of product good will within that area; and (3) the maintenance of a competitive price market in its area. In addition to these charges, which paralleled the

---

53. See page 831, *supra.*

claims of breach of contract, plaintiff also claimed that Pontiac failed to act in good faith with regard to the performance of service and warranty work and reimbursement of warranty claims, and, finally, claimed that Pontiac generally failed to act in a fair and honest fashion.

All of these "failures" on Pontiac's part were alleged to have taken place during "the time in question," which was the three-year period prior to the time plaintiff filed its complaint, i. e., from October 27, 1966 to October 27, 1969.[54] However, as previously noted,[55] the "period in question" with regard to the claim that Pontiac failed to act in good faith in the distribution and availability of new Pontiac vehicles would be only from October 27, 1966 to April of 1967 since the plaintiff's evidence was that it received all the Pontiacs it wanted and could sell after that time.[56] Consequently, regarding the distribution claim, the applicable period would be from October 27, 1966 to April 1967, and as to the rest of the claims from October 27, 1966 to October 27, 1969.

### A. The Requirements of the Dealer Act

The question to be resolved is whether the evidence adduced at the trial is legally sufficient to support a finding of lack of "good faith" as that term is defined in the Act.

■■ The Act creates a cause of action only in two specific instances: (1) when the manufacturer fails to act in good faith in terminating, cancelling or failing to renew the written franchise agreement with the dealer, or (2) when the manufacturer fails to act in good faith in complying with the terms of that written franchise agreement.[57] Only the second aspect of the Act is involved herein.[58]

Good faith is specifically defined in the Act, as follows:

"The term 'good faith' shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party *freedom from coercion, intimidation, or threats of coercion or intimidation* from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith." (Emphasis supplied) 15 U.S. C. § 1221(e)

■■ This statutory definition has been construed literally by the Courts so that the existence or non-existence of lack of good faith must be determined in a context of actual or threatened coercion or intimidation. H.R.Rep.No.2850, 84th Cong. 2d Session, U.S.Code Cong. and Admin.News pp. 4596, 4603 (1956); 7 A.L.R.3d 1182.[59]

■■ The Courts have uniformly and consistently held that there can be no recovery under the Act without a showing that the manufacturer was engaged in coercion, intimidation or threats of coer-

---

54. The Dealer Act contains a three-year statute of limitations. 15 U.S.C. § 1223.

55. See p. 835, *supra.*

56. See fn. 28, *supra.*

57. Section 1222. (b) Section 1221(b) of the Act defines the term "franchise" as the "written" agreement. A study of the legislative history shows that the use of the word "written" in defining "franchise" was not inadvertent but resulted from a careful and deliberate consideration of the entire matter. U.S.Code Cong. and Admin.News 1956, pp. 4596–4601.

58. Plaintiff voluntarily sold its business assets in April, 1970. See plaintiff's opening statement, p. 5; Corley Tr., pp. 16–17.

59. See, Milos v. Ford Motor Company, 317 F.2d 712, at 715, 716 (3rd Cir. 1963), cert. denied, 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed. 2d 125 (1963), in which the Court quotes at length from the legislative history of the Dealer Act, and the House debate prior to its passage. See also, Globe Motors, Inc. v. Studebaker-Packard Corp., 328 F.2d 645, at 647 (3rd Cir. 1964) where the same Court refused to agree with plaintiff's argument that "good faith" under the Act should be liberally construed.

cion or intimidation with respect to the dealer.[60]

 It appears there is no question that "failure to exercise good faith" within the meaning of the Act has a limited, restricted meaning. It does not mean "good faith" in a hazy, general way, nor does it mean unfairness, but the absence of coercion or intimidation. The burden of proving coercion is plaintiff's.[61] It must show that it was coerced in some way into doing something it had a lawful right not to do, under the threat of sanctions which would otherwise be applied. But more is required than simply coercion and failure to submit, for otherwise the manufacturer would be precluded from insisting upon reasonable and valid contractual provisions. Woodard v. General Motors Corp., 298 F.2d 121 (5th Cir.), cert. denied, 369 U.S. 887, 82 S.Ct. 1161, 8 L. Ed.2d 288 (1962); Berry Brothers Buick, Inc. v. General Motors Corp., D. C., 275 F.Supp. 542, aff'd per curiam, 377 F.2d 552 (3rd Cir. 1967).

 The evidence presented in this trial clearly shows the absence of any of the prohibitive acts of coercion or intimidation or threats thereof on the part of Pontiac.

### B. *Plaintiff's Specific Allegations*

There is no evidence in this record from which a jury could rationally infer that Pontiac failed to act in good faith, in the context of coercion and intimidation, with regard to the distribution and availability of new Pontiac automobiles. This Court dealt with the evidence in this regard in great detail in its discussion of this allegation as part of plaintiff's claim of alleged breach of contract, and that discussion will not be repeated here.[62]

Viewing the evidence in the light most favorable to plaintiff, as the Court must, the record shows that Pontiac shipped approximately twice the number of automobiles to Porter during the period of October 27, 1966 to April 1967 that it did to plaintiff,[63] and that plaintiff claimed that it had not received its "fair share" while Paul Porter received "too many" or more than his "fair share" of cars for his area of sales responsibility.

But the undisputed evidence was that plaintiff could not show even a single instance where Pontiac had refused to deliver cars ordered or unreasonably delayed the delivery of those orders. Plaintiff failed to introduce any proof at all concerning the number, kind, model and color of cars that it had actually ordered at any time, and there was no proof whatever concerning the availability of any Pontiac car ordered by plaintiff. There was no proof that Pontiac had shipped even a single more desirable model automobile to Porter or that Pontiac had made a single vehicle shipment to Porter in a more timely fashion that it did to plaintiff. To the contrary, plaintiff made no attempt to compare the orders which it had contemporaneously sub-

60. Frank Chevrolet Co. v. General Motors Corp., 304 F.Supp. 307 (N.D.Ohio 1968), aff'd, 419 F.2d 1054 (6th Cir. 1969); Kotula v. Ford Motor Company, 338 F.2d 732 (8th Cir. 1964), cert. denied, 380 U.S. 979, 85 S. Ct. 1333, 14 L.Ed.2d 273 (1965); Woodard v. General Motors Corp., 298 F.2d 121 (5th Cir. 1962), cert. denied, 369 U.S. 887, 82 S. Ct. 1161, 8 L.Ed.2d 288, reh. denied, 370 U. S. 965, 82 S.Ct. 1584, 8 L.Ed.2d 834 (1962); Hanley v. Chrysler Motor Corp., 433 F.2d 708 (10th Cir. 1970); Southern Rambler Sales, Inc. v. American Motors Corp., 375 F.2d 932 (5th Cir. 1967); Pierce Ford Sales, Inc. v. Ford Motor Co., 299 F.2d 425 (2d Cir. 1962), cert. denied, 371 U.S. 869, 83 S.Ct. 24, 9 L.Ed.2d 66 (1962).

61. Senate Rep.No.2073, 84th Cong., 2d Sess. 1956; Milos v. Ford, *supra*.

62. See pp. 834–841, *supra*.

63. Financial Statements, Exhibits 71 and FFFF. The evidence showed that between the period 1958 to November 1968, plaintiff's (and its predecessor) new retail sales of all brands of vehicles totalled 2,330 units compared with Porter's 1,673; and between the period 1966–68, plaintiff's total new retail sales were 774 compared with Porter's 716. Corley Tr., pp. 405–06; 425–26; 1067; 1155–59; Hayes Tr., p. 410.

mitted to Pontiac with those submitted by Porter, and, as noted previously, plaintiff did not elect to examine Porter's records.[64]

There was no claim that plaintiff had not made "fair" gross profits on its Pontiac sales, but to the contrary that it did. There was no claim that Porter's gross profits on its Pontiac sales were too low or too high, but to the contrary that they were almost identical to those of plaintiff. Plaintiff did claim that because it had a more modern dealership facility with higher operating costs compared with those of Porter's,[65] that somehow Pontiac engaged in "coercion" when it filled Porter's orders because some of those orders had allegedly exceeded the "requirements" of Porter's area of sales responsibility. No such obligation can be construed from the Agreement, or is it to be found in the law. See: United States v. General Motors, 384 U.S. 127, 146, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966).

In effect, plaintiff's claim was that although it was not required by Pontiac to order cars which were made available, but which it did not want, that Pontiac was not permitted to offer those cars to Porter if, by doing so, it meant exceeding the requirements of Porter's area of sales responsibility. The Court holds that Pontiac could not, consistent with its contractual obligations to Porter and with the requirements imposed by the Dealer and Sherman Acts, have refused to fill Porter's orders.

In other cases it has been held that there was no violation of the Dealer Act where (1) a dealer was not afforded a statutory right or formula for the allocation or delivery of particular cars and models, Augusta Rambler Sales, Inc. v. American Motors Sales Corp., 213 F. Supp. 889 (N.D.Ga.1963); (2) another dealer received more cars than its competitor during a period of production shortage, Globe Motors, Inc. v. Studebaker-Packard Corp., 328 F.2d 645 (3rd Cir. 1964); (3) one dealer gets a higher percentage of cars alloted than another, Leach v. Ford Motor Company, 189 F. Supp. 349 (N.D.Cal.1960); (4) a dealer can't secure all the fast moving models he desires, Bateman v. Ford Motor Co., 204 F.Supp. 357 (E.D.Pa.1962); or (5) there are mere delays in deliveries without also a showing of willfulness or arbitrariness, for delays are normal operational hazards in the industry during initial months of new model years, General Motors v. Mac Company, 247 F.Supp. 723 (D.Colo.1965).

As summarized in the section on breach of contract and here, the evidence leaves no doubt that there was no lack of good faith dealings on the part of Pontiac Motor Division, and that all of the acts complained of were free from coercion and intimidation within the meaning of the Act. Since there is no evidence from which a jury could have rationally inferred coercion or intimidation, plaintiff has failed to sustain its burden of proof concerning the distribution of Pontiacs.

The Court has determined that there is no evidence from which a jury could have rationally inferred that Pontiac had failed to act in good faith with regard to promotion of product good will in plaintiff's area of sales responsibility. As set out in the opinion discussion on the claim of breach of contract, there simply is no evidence of any breach of Pontiac's contractual obligations,[66] much less the prohibitive act of "coercion." On the contrary, plaintiff's evidence

---

64. See p. 830, fn. 11, *supra*. In view of the destruction of vehicle orders, etc., while suit was pending, the strong inference is that had plaintiff produced them, they would not have supported plaintiff's position. A. C. Becken Co. v. Gemex Corp., 314 F.2d 839 (7th Cir. 1963); Dow Chemical (U.P.K.) v. S.S. Giovanella D'Amico, 297 F.Supp. 699 (S.D.N.Y.1969).

65. The Court observes that plaintiff operated a multiple franchise dealership compared to Porter's franchise of only the Pontiac line. Obviously, plaintiff needed larger facilities.

66. See p. 831, *supra*.

showed that Pontiac vehicles were highly desirable products and that such a reputation had been externally created by Pontiac.[67]

■ Likewise, this Court dealt fully with the allegations concerning Pontiac's alleged failure to maintain a competitive price market in plaintiff's area in its discussion of this issue relative to the breach of contract claim,[68] and the conclusions reached there are applicable here. There was no proof from which the jury could rationally infer that Pontiac sold plaintiff its products at other than "fair and competitive" prices. In fact, the evidence supported, and demanded, the opposite conclusion, that Pontiac charged plaintiff the same prices that it charged all other dealers for the same products,[69] and that plaintiff made fair and adequate profits on its sale of Pontiac products.[70] And, again, this Court is compelled to take note that had Pontiac acted to assist plaintiff in maintaining a "competitive" price by refusing to fill Porter's orders or by confining Porter's competitive activities to his area of sales responsibility, it would have been a clear and obvious violation of the antitrust laws as well as the Dealer Act.

■ This Court also notes that there is no provision in the Agreement whereby Pontiac is obliged to maintain prices in plaintiff's area.[71] Since the Dealer Act deals with the failure of the manufacturer to act in good faith in complying with the terms of a *written* franchise agreement, and since there is no such provision in the agreement between these parties, it follows that the plaintiff cannot recover on this ground.[72]

■ This Court further finds that plaintiff did not offer any evidence to show that Pontiac had failed to deal with plaintiff in other than a fair and honest fashion; accordingly, there is no evidence of a lack of good faith as required by the Dealer Act.

This then brings the Court to the only substantive allegation under the Dealer Act which has not been previously dealt with under breach of contract—that Pontiac failed to act in good faith regarding the performance of warranty work and the reimbursement of warranty claims.

■ Viewing the evidence in a light most favorable to plaintiff, it tends to prove only that Pontiac delayed reimbursing plaintiff for warranty work until plaintiff had submitted properly prepared warranty claim forms in accordance with the procedures prescribed by the Pontiac Agreement and Service and Policy Procedure Manual. No evidence was introduced that Pontiac had failed to pay plaintiff for any warranty claims which had been properly prepared or that, with respect to any of the delayed claims, Pontiac had not eventually reimbursed plaintiff.

Cecil Corley, Jr. and plaintiff's former service manager each acknowledged that Pontiac was not obligated to reimburse or issue credit to plaintiff for warranty work if plaintiff submitted incorrect or improperly prepared warranty claims.[73] The evidence is that warranty claims are mailed by Pontiac dealers to Pontiac's Warranty Computer Center in Michigan.[74] If the warranty claim form is properly prepared, then the dealer is issued credit for the work. If the warranty claim form has not been prepared in accordance with the prescribed procedures, then no credit is issued until after such time as the claim is returned to

67. See fn. 12, page 831, *supra.*

68. See pp. 831–834, *supra.*

69. See fn. 14, page 832, *supra.*

70. See fn. 15, page 832, *supra.*

71. Corley Tr., p. 689.

72. See, Lawrence Chrysler-Plymouth, Inc. v. Chrysler Corp., 461 F.2d 608 (7th Cir.

1972) ; Artman v. International Harvester, 355 F.Supp. 482 (W.D.Pa.1973) ; Alfieri v. Willys Motors Inc., 227 F.Supp. 627 (E.D. Pa.1964).

73. Corley Tr., pp. 811–29 ; 830–35 ; Wilson Tr., pp. 20–22 ; 39–40 ; 42–47 ; 62–64.

74. Wilson Tr., pp. 38–40 ; Exhibit QQ, Service Procedure Manual.

Pontiac by the dealer in proper form. See, Miller Motors v. Ford Motor Company, 149 F.Supp. 790 (M.D.N.C.1957) where the Court stated:

"Unless the required procedure is followed, the dealer may encounter considerable difficulty or delay in securing reimbursement for warranty work done and parts used." 149 F.Supp. at 796

Plaintiff's witnesses admitted that it was a common occurrence for plaintiff to have to correct its claims and to resubmit them to Pontiac before credit would be issued; that a number of the claims in dispute had properly been returned by Pontiac because they contained unauthorized flat rate time operations greater than what had been contractually agreed upon between the parties or that they had not been submitted within the time period allowed by the Tennessee Motor Vehicle Code and the contract terms with Pontiac.[75]

Gordon Wilson testified that although Pontiac was slow in paying, it always sent back an explanation with rejected claims.[76] He further testified about a problem concerning the obtaining of prior approval for a warranty repair which required such authorization, but he was able to clear this up by meeting with the Pontiac service representative at another Pontiac dealer in Nashville;[77] and that on repairs requiring prior approval, he could most always obtain such approvals by telephone, thus avoiding any delay to the customer.[78]

Wilson admitted that a number of the warranty claims in dispute actually involved claims which had to be returned to plaintiff for correction and resubmission, for they had been submitted to the Pontiac Warranty Center on incorrect forms;[79] that a number of those claims had never even been forwarded before to Pontiac for credit; that a number of the claims had been returned because plaintiff had failed to attach the prior Zone approval forms as required; that recorrected claims had to be resubmitted to Pontiac before payment could be made;[80] and that a number of the alleged untimely paid claims[81] had been returned to plaintiff for correction because they had contained unauthorized flat rate time operations.[82]

The evidence summarized above shows clearly the absence of any evidence from which the jury could rationally infer that Pontiac had acted toward plaintiff in the context of coercion within the meaning of the Dealer Act. The evidence is that plaintiff failed to submit its warranty claims in accordance with the prescribed procedures and that when it did, Pontiac reimbursed it for the work performed. Since plaintiff failed to establish that its claims were timely and properly filed as required, there is no evidence of any unreasonableness on the part of Pontiac, much less the required lack of good faith dealings.

However, absent this inadequacy in the proof, plaintiff's claim under the Act in this regard fails for another reason. *A delay, and even an unreasonable delay* in issuing credits or paying money due, *is insufficient* to state a claim under the Act *unless* there is evidence that such conduct was used by the manufacturer to *coerce* plaintiff against

75. Corley Tr., pp. 811–18; 826–28; 831–35; 1358; Wilson Tr., pp. 20–22; 30–31; 37–39; 40–45; 46–48; 50–57; 59–64; 71–72. For certain kinds of warranty repairs to be performed by the dealers, Pontiac establishes a specific hourly time allowance that a dealer could charge Pontiac. Additionally, the dealer and Pontiac negotiate and agree upon the hourly dollar rate for the dealer's mechanics at which Pontiac reimburses the dealer. See Exhibit WWW, a Consent Decree entered into between General Motors and the State of Tennessee holding that General Motors'

warranty reimbursement practices are in compliance with the laws of Tennessee.

76. Wilson Tr., pp. 20–22; 58.

77. Wilson Tr., pp. 25–26.

78. Wilson Tr., pp. 35–36.

79. Wilson Tr., pp. 41–43.

80. Wilson Tr., pp. 40–45; 60–62; 71–72.

81. Plaintiff's Exhibit 50.

82. Wilson Tr., p. 46.

his will. Lawrence Chrysler-Plymouth, Inc. v. Chrysler, 461 F.2d 608 (7th Cir. 1972); Garvin v. American Motors Sales Corp., 318 F.2d 518 (3rd Cir. 1963); Allen Gaines, Inc. v. Chrysler Motors Corp., 1973 Trade Cases, ¶ 74,557 (N.D.Ill.1973).

Thus, this Court finds that the proof was insufficient to justify the jury in finding the existence of any lack of good faith on the part of Pontiac as to amount to coercion, intimidation, or threats of coercion and intimidation.[83] Additionally, plaintiff *failed* to introduce *any evidence* that such conduct on the part of Pontiac caused it *any pecuniary loss*.

### III

### THE ROBINSON-PATMAN ACT

General Motors' motion, addressed to the Robinson-Patman claim, raises two questions for the Court's consideration. The first is whether the prohibition against discrimination in the furnishing of "services or facilities" contained in Section 2(e) of the Robinson-Patman Act, 15 U.S.C. § 13(e), applies to the claim that a manufacturer has discriminated in the allocation of available supplies of its product or the timeliness of its deliveries. If such discrimination does constitute a violation of the Act, the second question is whether plaintiff produced sufficient evidence to show injury by reason of that discrimination on which a jury could rationally ground a verdict.

■ This is a case of first impression in this district. For its authority that such discrimination, if proved, would violate Section 2(e), the plaintiff relied on the decision by the Seventh Circuit, Centex-Winston Corp. v. Edward Hines Lumber Co., 447 F.2d 585 (7th Cir. 1971), cert. denied, 405 U.S. 921, S. Ct. 956, 30 L.Ed.2d 791 (1972). The de-

fendant has contended that Section 2(e) does not apply to the allocation or timeliness of deliveries of various models of automobiles to competing dealers. This Court agrees and holds that the allocation or timeliness of deliveries is not within the purview of Section 2(e) of the Robinson-Patman Act. Furthermore, even if such discrimination were to constitute a violation of the Act, which it does not, there is no evidence from which the jury could rationally infer that Pontiac discriminated against the plaintiff, or even if there had been discrimination in the allocation or timeliness of deliveries of various models of automobiles, that the plaintiff suffered injury by reason of that discrimination.

■ The principal objective of Section 2(e) of the Robinson-Patman Act is to strengthen the prohibition of unfair price discrimination contained in Section 2(a) of the Act by also prohibiting disguised or indirect price discriminations in the form of advertising allowances and sales promotional services. Referring to advertising and promotional allowances as a method of disguised price discrimination, the House Judiciary Committee said:

"Still another favored medium for the granting of oppressive discrimination is found in the practice of large buyer customers to demand, and of their sellers to grant, special allowances in purported payment of advertising and other sales promotional services, which the customer agrees to render with reference to the seller's products or sometimes with reference to his business generally. Such an allowance becomes unjust when the service is not rendered as agreed and paid for, or when, if rendered, the payment is grossly in excess of its value, or when in any case the customer is deriving from it equal benefit to his own business and is thus enabled to shift to

---

83. The only evidence in this record of coercion or threats thereof is on the part of plaintiff. By threat of litigation and disparagement of Pontiac officials, it sought to engage Pontiac in violation of the Dealer and Sherman Acts. See discussion at pp. 832–834, *supra*, and see fn. 116, *infra*.

his vendor substantial portions of his own advertising cost, while his smaller competitor, unable to command such allowances, cannot do so." H.R.Rep. No.2287, 74 Cong. 2d Sess. 15–16 (1936).

██ The provisions of the bill governing disguised price discrimination were contained in two sections, which, as enacted, were 2(d) and 2(e).[84] The Report of the Conference Committee of the House of Representatives, H.R.Report No.2951, 74th Cong., 2d Sess., p. 7 (1936), stated clearly that the purpose of Sections 2(d) and 2(e) was to provide that advertising, services, and facilities were available to all buyers on a proportionately equal basis.

Similarly, the Congressional managers of the bill made clear its purpose. On the floor of the Senate, Senator Logan, floor manager of the bill, said Sections 2(d) and 2(e) were intended to end the practice of evading the provisions of the Clayton Act by allowing large purchasers advertising allowances which amounted to price discrimination. 80 Cong.Rec. 6282 (1936). In a single paragraph, Representative Utterbach, Chairman of the Senate-House Conference Committee, explicitly stated that the bill was intended to end those forms of disguised price discrimination in which the buyer received not payments of money, but other forms of "services and facilities" which proved to be equivalent to direct payments.

"The Bill prohibits the seller from paying the customer for services or facilities furnished by the latter in connection with the seller's goods un-

less such payment is available on proportionally equal terms to all other competing customers. The existing evil at which this part of the Bill [2(d)] is aimed is, of course, the grant of discrimination in the guise of payments for advertising and promotional services which, whether or not the services are actually rendered as agreed, result in an advantage to the customer so favored as compared with others who have to bear the cost of such service themselves. The prohibition of the Bill, however, is made intentionally broader [2(e)] than this one sphere in order to prevent evasion in resort to others by which the same purpose might be accomplished, and it prohibits payment for such services or facilities, whether furnished in connection with the processing, handling, sale or offering for sale of the products concerned." 80 Cong.Rec. 9418 (1936).

Likewise, authoritative commentaries strongly support the position that Sections 2(d) and 2(e) were limited to ending disguised price discriminations in the form of advertising and promotional payments and cooperative merchandising programs. Congressman Wright Patman, co-author of the Robinson Patman Act, not only quotes with approval the purpose of Sections 2(d) and 2(e) as enunciated by Congressman Utterbach on the floor of the House (Patman, Complete Guide to the Robinson-Patman Act 1963, Prentice Hall, p. 130), but also affirmatively states that the intent of Congress in passing Sections 2(d) and 2(e) was to outlaw special discounts and

84. 2(d). It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.

2(e). It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.

rebates (*Id.* at 129). Referring to Sections 2(d) and 2(e), he further states:

" . . . The words must be interpreted as requiring a seller pay or furnish the benefits in *cooperative merchandising* where requested by the customers or purchasers after the seller has openly and actually made it known benefits would be available." (Emphasis supplied). Patman, at 138.

Another leading commentator on the Robinson-Patman Act, Fredrick M. Rowe, in his book Price Discrimination Under the Robinson-Patman Act (1962), reviewed the legislative history of the Act and concluded:

"In sum, the objective of Sections 2(d) and 2(e) was to enact a strict prohibition on specifically defined promotional arrangements which operated to confer concealed discriminatory benefits on favored buyers. Such discriminatory advantage arose if the customer received promotional payments without a quid pro quo, or which 'subsidized' the promotion of his business to the detriment of his competitors unable to secure comparable arrangements. On the other hand, a seller's terms of sale or concessions *not* in respect of actual or purported promotional activities were to be measured by legal provisions governing direct or indirect discriminations in price. Also, the prescribed grant of promotional concessions on 'proportionately equal' terms was not to inhibit ordinary advertising activities which did not bring about disguised discriminatory favoritism condemned by Congress." Rowe, at 371–372

In the word of the Supreme Court, "Since precision of expression is not an outstanding characteristic of the Robinson-Patman Act," Automatic Canteen Co. v. F. T. C., 346 U.S. 61, 65, 73 S.Ct. 1017, 1020, 97 L.Ed. 1454 (1953), courts have insisted upon exact formulation of the issues before them and have looked to the legislative history of the Act to avoid inadvertent pronouncements on and loose construction of the statutory language. Courts have repeatedly resisted attempts to expand the scope of Sections 2(d) and 2(e) [85] beyond the limited area of applicability intended by Congress. Skinner v. United States Steel Corp., 233 F.2d 762 (5th Cir. 1956); Cook v. Ralston Purina Co., 366 F.Supp. 999, 1011 (M.D.Ga.1973); New Amsterdam Cheese Corp. v. Kraftco Corp., 363 F.Supp. 135 (S.D.N.Y.1973).

■ The Robinson-Patman Act was intended to end direct and indirect price discrimination in the sale of products of like grade and quality sold in interstate commerce for the purpose of resale. Among those "services and facilities" held to be within Sections 2(d) and 2(e) have been any kind of advertising, catalogs, demonstrators, display and storage cabinets, display materials, hand bills, special packaging or package sizes, warehouse facilities, accepting returns for credit, prizes or merchandise for conducting promotional contests, and "monetary awards" paid by the seller to clerks, salesmen, and other employees of the customer for special sales or promotional efforts. Patman, *supra,* p. 134.

■ On the other hand, the Act is not all-encompassing, and does not provide relief against every form of unfair or inequitable treatment of customers. It does not, for example, reach what arguably is the most extreme discrimination of all: namely, a total refusal to even deal with a particular individual or class of customers. As the Fifth Circuit said in Skinner v. United States Steel Corp., 233 F.2d 762 (5th Cir. 1956),

85. Although the text of Sections 2(d) and 2(e) contain semantic variation, § 2(e) has long been viewed as coterminous with § 2(d), and courts have consistently resolved the two sections into a harmonious whole. 82 Harv.L.Rev. 63, 269–70 (1968), Rowe, *supra,* at 390; Elizabeth Arden Sales Corp. v. Gus Blass Co., 150 F.2d 988, 992–993 (8th Cir. 1945), cert. denied, 326 U.S. 773, 66 S.Ct. 231, 90 L.Ed. 467 (1945); Elizabeth Arden, Inc. v. F.T.C., 156 F.2d 132 (2d Cir. 1946), cert. denied, 331 U.S. 806, 67 S. Ct. 1189, 91 L.Ed. 1828 (1947).

when it held that withholding from its employees' wages amounts owing by employees to a wholly-owned customer of the supplier, but not affording the same service to other customers of the supplier did not come within the meaning of Section 2(e):

"The prohibition of Section 2(e) is not against every discrimination, nor even against every discrimination in the course of interstate commerce.

. . .

The language is neither complex nor are the words technical. Neither the legislative history nor the judicial interpretation of the quoted words [services or facilities] requires us to depart from their literal meaning.

. . . In other words, the services or facilities that must be made available on proportionally equal terms to all purchasers in competition are merchandising services or facilities." *Id.* at 765, 766

Other practices held not to be within the prohibitions of Section 2(e) have included a supplier's offering favorable credit terms or authorizing the extension of credit to select customers, Seca-tore's, Inc. v. Esso Standard Oil Co., 171 F.Supp. 665 (D.Mass.1959); Clausen & Sons v. Theo. Hamm Brewing Co., 284 F.Supp. 148 (D.Minn.1967), rev'd on other grounds, 395 F.2d 388 (8th Cir. 1968); Cook v. Ralston Purina Co., 366 F.Supp. 999 (M.D.Ga.1973); a supplier's offering favorable real estate transactions and terms of financing to a distributor, Rea v. Ford Motor Company, 355 F.Supp. 842 (W.D.Pa.1973), aff'd in part and rev'd in part, 497 F.2d 577 (3rd Cir. 1974) (no discussion of decision of District Court with regard to Robinson-Patman Act); a supplier's denial to disfavored customers of the privilege of purchasing produce in car lots at a freight terminal rather than at public auction, Ben B. Schwartz & Sons v. Sunkist Growers, Inc., 203 F.Supp. 92 (E.D.Mich.1962); and a supplier's refusal to deal in part of its line of merchandise with one customer while deal-ing in all of its lines of merchandise with other customers, New Amsterdam Cheese Corp. v. Kraftco Corp., 363 F. Supp. 135 (S.D.N.Y.1973).

From the decided cases, it is apparent that the prohibitions of Section 2(e) of the Robinson-Patman Act provide only that a seller shall not grant "services or facilities" relative to advertising, promotions or merchandising with respect to goods of like grade and quality to a purchaser for resale of *such commodities* unless he makes such services or facilities available to all his purchasers for resale on a proportionately equal basis. Since promotions, advertising or merchandising services are not at issue in this case, this Court holds Section 2(e) does not apply to this factual situation. This Court concludes that allocations and timeliness of deliveries of product are not within the purview of Section 2(e).

It appears to this Court that in Centex-Winston v. Edward Hines Lumber Co., 447 F.2d 585 (7th Cir. 1971), the Seventh Circuit attempted to expand Section 2(e) beyond disguised or indirect price discrimination. To this Court, this expansion seems contrary to the admonition of the Supreme Court, to the legislative history of the Act, and to judicial decisions construing the statutory language of the Act. For those reasons, this Court has chosen not to follow the *Centex-Winston, supra,* decision. Moreover, since *Centex-Winston, supra,* was decided, the Seventh Circuit appears to have retreated to a more precise reading of the Act. In Kirby v. P. R. Mallory & Co., Inc., 489 F.2d 904 (7th Cir. 1973), the Court said:

". . . [A] seller's payments as well as services in connection with the *original* sale to the purchaser rather than with regard to the purchaser's subsequent *resale* were not cognizable under §§ 2(d) or 2(e), but were challenged only under 2(a) as indirect price discrimination." 489 F.2d at 910 (Emphasis in original)

In *Kirby,* the Seventh Circuit concluded its discussion of the Robinson-Patman Act thusly:

"In view of the strict standards of §§ 2(d) and 2(e), which focus on resale, it appears quite clear that Congress carefully considered the deficiency in the original law proscribing price discrimination in .the supplier-customer sale and drafted §§ 2(d) and 2(e) to apply exclusively to promotional discriminations like those alleged in this case." See *Rowe, supra,* at 362–376. 489 F.2d at 910.

Like *Kirby,* all the acts complained of in this case have been in regard to the *original* sale of various models of automobiles and not their *resale* to customers of the dealers and, therefore, by the reasoning of the Seventh Circuit, outside the perimeters of the Act. The reasoning of the Seventh Circuit in the *Kirby* case accurately adopts the legislative intent as stated in the Report of the Conference Committee which drafted the final version of the Robinson-Patman Act that "the bill should be unapplicable to the terms of sale except as they amount in effect to indirect price discriminations in price within the meaning" of subsection 2(a) H.R.Rep.No. 2951, 74th Cong.2d Sess. 5 (1936). For the above reasons, as a matter of law, this Court holds that the plaintiff has not stated a claim actionable under Section 2(e) of the Robinson-Patman Act, sets aside the verdict of the jury, and enters judgment in favor of General Motors.

However, if the Court were to follow *Centex-Winston,* the question would become whether the plaintiff proved by a fair preponderance of the evidence a claim under Section 2(e) for which he is entitled to relief. To establish a cause of action and recover damages under Section 2(e), the plaintiff must prove that (1) its competitor received a service or facility relating to the resale of commodities of like grade and quality; (2) that Pontiac did not offer to make available a similar benefit on a reasonably contemporaneous sale to the disfavored customer on a proportionately equal basis; Kirby v. P. R. Mallory, 1973–2 Trade Cases, ¶ 74,801 (7th Cir. 1973); Atalanta Trading Corp. v. F.T.C., 258 F.2d 365 (2d Cir. 1958); Dantzler v. Dictograph Products, Inc., 309 F.2d 326, 328 (4th Cir. 1962), cert. denied, 372 U.S. 970, 83 S.Ct. 1097, 10 L.Ed.2d 133 (1963); and (3) the challenged discrimination proximately caused it to suffer actual damage; Dantzler v. Dictograph Products, Inc., 272 F.2d 172 (4th Cir. 1959); Sun Cosmetic Shoppe, Inc. v. Elizabeth Arden Sales Corp., 178 F.2d 150 (2d Cir. 1949); State Wholesale Grocers v. Great Atlantic & Pacific Tea Co., 258 F.2d 831, 839 (7th Cir. 1958), cert. denied, 358 U.S. 947, 79 S.Ct. 353, 3 L.Ed.2d 352 (1959).

In this case, the plaintiff simply failed to prove any discrimination against it or favoritism by Pontiac to Porter in the timeliness of deliveries or the allocation of like models of comparably equipped automobiles. The evidence plaintiff submitted in support of its claim were charts [86] which purported to show that its competitor Porter received a higher percentage of the number of cars he sold annually earlier in the model year than it did. The plaintiff attempted to use this chart as *prima facie* evidence of discrimination.

The plaintiff admitted that it received no automobiles from Pontiac unless it had first placed an order for the automobile with Pontiac.[87] The plaintiff said it could compare the elapsed time between the date of order and the date of delivery of comparable models of automobiles if it had the orders and preference list submitted to Pontiac. It could not do this, however, because it had destroyed the order forms and preference

---

86. Exhibits 17–18.

87. Section 3C of the Agreement; Hayes Tr., pp. 209–13; 295; Corley Tr., pp. 871–78; 1123–26; 1126–27; 1255; 1265.

lists [88] and failed to inspect Porter's although they were made available to it.[89]

The plaintiff submitted no proof as to how many orders or what types of automobiles it ordered early in the model year and it did not offer any evidence as to how many or what type of automobile orders Porter submitted; it did not offer any evidence as to the percentage of orders from each dealer which Pontiac received, the percentage filled, or the time Pontiac needed to make delivery; it did not show any variances in the time Pontiac took to deliver the same model automobile comparably equipped to either dealer. Plaintiff did not prove a single instance where Pontiac did not honor its order or deliberately delayed delivery of its orders. Plaintiff did not even show an instance when Porter received an automobile of like grade and quality in shorter time than it did.

Viewed in the light most favorable to the plaintiff, there was a complete failure of proof that in offering services and facilities in conjunction with the resale of automobiles of identical models comparably equipped, Pontiac did not treat the dealers identically, or at least on a proportionately equal basis. Further, with respect to damages, even if such discrimination did exist, plaintiff did not prove the fact of its damage or the amount of its damage in terms of net lost profits attributable to such discrimination or out-of-pocket expenses which it incurred to provide it with the services or facilities which Pontiac denied it. For these reasons, judgment must be entered in favor of Pontiac Motor Division.

IV

DAMAGES

■ Although this Court, for the reasons heretofore given, grants judgment N.O.V. in favor of General Motors, or, in the alternative, a new trial, nevertheless, it feels compelled to discuss the manner in which the damage issue was presented to the jury. After a thorough examination of the record, this Court has "more than grave doubt as to the substantiality of the evidence offered by the plaintiff to support this aspect of its claim for damages." [90] It is the view of this Court that plaintiff's witnesses indulged in speculation, surmise or conjecture, and that there was insufficient evidence from which the jury could have rationally inferred that plaintiff suffered legally recoverable damages in any amount.

A. *The Applicable Legal Standards*

■■ If a violation of the Dealer Act occurs, the dealer is entitled to recover only the actual damages sustained by reason of the failure of the manufacturer to act in good faith in performing or complying with the written terms of the franchise. 15 U.S.C. § 1222; H.R. No. 2850, 84th Cong. 2d Sess. esp. p. 8. A showing of actual damages is an essential element to a cause of action under the Act, and a showing of all elements specified by the Act are necessary in order to sustain recovery.[91]

88. Corley Tr., pp. 404, 655–58; 855–60; 871–78; 953–54; 1026–28; 1115–18; 1148–53; 1193–94; Hayes Tr., pp. 45–46; 225; 296; 465–70.

89. Corley Tr., pp. 659; 1001–1005; 1107–08; 1112–14.

90. Elder-Beerman Stores Corp. v. Federated Department Stores, Inc., 459 F.2d 138, at 149 (6th Cir. 1972).

91. See, for example, the following analogous authorities: Milos v. Ford Motor Company, 317 F.2d 712 (3rd Cir. 1963), cert. den., 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 125 (1963); Garvin v. American Motor Sales Corp., 318 F.2d 518 (3rd Cir. 1963); Globe Motors Inc. v. Studebaker-Packard Corporation, 328 F.2d 645 (3rd Cir. 1964); Berry Bros. Buick, Inc. v. General Motors Corp., 257 F.Supp. 542 (E.D.Pa.1966), aff'd, 377 F.2d 552 (3rd Cir. 1967); Jim Barnett Motors, Inc. v. Ford Motor Company, 355 F.2d 502 (5th Cir. 1966); Southern Rambler Sales, Inc. v. American Motors Corp., 375 F.2d 932 (5th Cir. 1967), cert. denied, 389 U.S. 832, 88 S.Ct. 105, 19 L.Ed.2d 92 (1967); R.A.C. Motors, Inc. v. World-Wide Volkswagen Corp., 314 F.Supp. 681 (D.N.J. 1970).

Plaintiff's claims for damages were premised on two factors—lost sales and lost profits.[92] It offered no direct evidence of any lost sales nor did it prove loss of net profits. An award of damages for lost profits must be based on net profit. Deaktor v. Fox, 475 F.2d 1112, 1116 (3rd Cir. 1973); Simpson v. Union Oil Company, 411 F.2d 897, 909 (9th Cir. 1969); and PSG Company v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 417 F.2d 659, 663 (9th Cir. 1969); Wolfe v. National Lead Company, 225 F.2d 427, 431 (9th Cir. 1955); Peter v. Union Oil Company of California, 328 F.Supp. 998, 1003 (C.D.Cal.1971); L.W. Umphres v. Shell Oil Co., 1973 Trade Cases, ¶ 74,709 at p. 95,135 (S.D.Tex.).

Whether Michigan or Tennessee law controls the *breach of contract count,* lost profits may be a proper element of damages if they can be determined with that fair degree of certainty necessary to take the recovery out of the realm of speculation or conjecture. Serbinoff v. Dukas, 348 Mich. 69, 81 N.W. 2d 236 (1957); Barrett v. Grand Rapids Veneer Works, 110 Mich. 6, 67 N.W. 976 (1895); Fell v. Newberry, 106 Mich. 542, 64 N.W. 474 (1895); Talcott v. Crippen, 52 Mich. 633, 18 N.W. 392 (1884).[93] Mathematical precision or exactness is not necessary, but a plaintiff must prove lost profits with reasonable or fair certainty. Redinger v. Standard Oil Co., 6 Mich.App. 74, 148 N.W.2d 225 (1967).

In a *private action under §* *2(e) of the Robinson-Patman Act,* a claimant is required not only to allege and prove that a violation of one of the antitrust laws has occurred, but also that such violation was the legal cause of a measurable injury to the claimant's business or property. Keogh v. Chicago

& Northwestern Railway Company, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). And a plaintiff attempting to show injury under the antitrust laws, by reason of lost sales or profits, must present direct evidence of such losses caused by the alleged unlawful conduct. Dantzler v. Dictograph Prods., Inc., 309 F.2d 326, 329 (4th Cir. 1962), cert. den., 372 U.S. 970, 83 S.Ct. 1097, 10 L.Ed.2d 133 (1963); Herman Schwabe, Inc. v. United Shoe Mach. Corp., 297 F.2d 906, 913 (2d Cir.), cert. denied, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962); American Sea Green Slate Co. v. O'Halloran, 229 F. 77, 81 (2d Cir. 1915).

A plaintiff must provide "a sufficient basis for the jury's computation of damages . . ." Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 266, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946) and must present "data from which the amount of probable loss could be ascertained as a matter of reasonable inference." Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1925). A plaintiff may not indulge in "theories that result in proof that is speculative, remote and uncertain" but must "furnish some approximation of the actual damages so that they may be determined with reasonable certainty." Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383, 392 (6th Cir. 1962); citing *Bigelow, supra,* and *Eastman Kodak, supra.* A jury must not be required to resort to speculation and conjecture to arrive at a figure. Emich Motors v. General Motors Corp., 181 F. 2d 70 (7th Cir. 1950).

Plaintiff introduced its damage theory in part through the testimony of an expert witness, and in part by way of its accountant. Damages calculated by

---

92. Plaintiff's Exhibits 70, 77 and 78.

93. The result would be the same if Tennessee law applied. See: Chisolm & Moore Mfg. Co. v. United States Canopy Co., 111 Tenn. 202, 77 S.W. 1062 (1903); Anderson-Gregory Co., Inc. v. Lea, 51 Tenn.App. 612, 370 S.W.2d 934 (1963); Oman Construction Co. v. City of Nashville, 49 Tenn.App. 171, 353 S.W.2d 97 (1961); Buice v. Scruggs Equipment Co., 37 Tenn.App. 556, 267 S.W. 2d 119 (1953); and Act-O-Lane Gas Service Co. v. Clinton, 35 Tenn.App. 442, 245 S.W. 2d 795 (1951).

accountants and experts cannot be based upon assumptions which are not supported by the record, and cannot be based upon speculation or guesswork. All of the premises upon which their conclusions are based must be supported by, and comport with, the testimony actually offered in court. Flintkote Co. v. Lysfjord, 246 F.2d 368 (9th Cir. 1957) cert. den., 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957); Sunkist Growers, Inc. v. Winckler & Smith, 284 F.2d 1 (9th Cir. 1960); Baush Mach. Tool Co. v. Aluminum Co. of America, 79 F.2d 217 (2d Cir. 1935); and Syracuse Broadcasting Corp. v. Newhouse, 319 F.2d 683 (2d Cir. 1963).

Experts cannot come into court and offer as proof calculations and theories which they do not themselves support or advocate, but which are designed to reach a desired conclusion, when those calculations have no sound basis in fact or reason. Joseph E. Seagram and Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (9th Cir. 1969). And an expert opinion may not, itself, be based upon the opinion of others, either in evidence or not in evidence. Taylor v. B. Heller and Co., 364 F.2d 608 (6th Cir. 1966).

Applying these legal principles to the evidence offered by plaintiff on this issue, this Court concludes that the plaintiff failed to show actual damages sustained and failed to establish, with any fair degree of certainty, that it lost sales or net profits [94] during the period in question.[95] The jury could not have ascertained plaintiff's probable loss as a matter of reasonable inference. Plaintiff's proof was based upon assumptions not found in, nor supported by, the record, and the jury was required to indulge in speculation, conjecture and guesswork in order to arrive at a figure.

### B. *Plaintiff's Theory and Proof*

Plaintiff's theory of damages was propounded by plaintiff's accountant, Glenville Hayes, and its expert, Professor William N. Leonard, through exhibits and testimony as to the "variable net profit" per new car sold by plaintiff during a given period, which was then multiplied by the additional number of Pontiac cars plaintiff would have received *had the distribution of Pontiacs to plaintiff been either identical to that of Porter, or if it had been on the basis of certain population-income ratios.* Variable net profit is calculated by adding together the gross profits of the *entire new and used car departments*, i. e., Oldsmobile, Pontiac, etc., and deducting from that figure the variable selling expenses (those expenses which tend to vary in direct proportion with volume) and then dividing that figure by the *total new car unit sales.*

The primary vehicle for the introduction of this theory was Exhibit No. 70, prepared by Mr. Hayes, who first calculated the break-even point for each year, that is, the number of new cars plaintiff had to sell at his average variable net profit, in order to absorb the dealership's actual fixed overhead expenses

94. This Court notes that plaintiff earned net profits of only $23,500.00, during the entire period of 1966–68 on all four of its lines and related operations (Plaintiff's Exhibit 71) and yet does not claim to have been damaged at all by the actions of three of those lines, Oldsmobile, GMC Truck, and American Motors. The Court also observes that the jury awarded plaintiff compensatory damages of $189,000.00 on breach of contract count.

95. This Court has already noted that the time span with regard to breach of contract and the Robinson-Patman Act, is from January 19, 1966, to April of 1967, and, with regard to the Dealer Act, from October 29, 1966 to April of 1967. Obviously, no damages can be collected by the corporation prior to its existence, and the dealership received all the Pontiacs it wanted and could sell after April of 1967. Therefore, the plaintiff had to show that it was entitled to a sum calculable with reasonable certainty between those periods. The corporate plaintiff took the market as it found it on January 19, 1966, with full knowledge of its condition, and consequently it cannot recover unless it was shown, which it was not, that the market was additionally affected by acts of the defendants occurring after the corporate plaintiff acquired its franchise.

which had not been covered by the gross profits of the parts and service departments. Mr. Hayes relied on two assumptions, both of which were unsupported by the proof: (1) that plaintiff should have received the same number of Pontiacs as did Paul Porter; and (2) that beyond the break-even point, no matter how many additional new car sales plaintiff may have made, i. e., whether it involved 100 or 300 additional sales, the additional profits generated by the parts and service departments would off-set any additional expenses, and, consequently, variable net profit would be tantamount to net profit. Hayes then multiplied the alleged additional sales by the variable net per unit, and arrived at a figure which he called the "cumulative damage."

Dr. Leonard used the same variable net figure. In fact, Hayes influenced him to use the variable net, and he relied heavily on Hayes to support its validity.[96] However, instead of assuming that plaintiff should have received the same number of Pontiac cars as Porter, Dr. Leonard calculated the relative family income between plaintiff's and Paul Porter's area of sales responsibility, and opined that since plaintiff's area had about 70% of the total income it should have been shipped 70% of the Pontiacs. Dr. Leonard added up the actual Pontiac shipments to the two dealerships, and multiplied 70% of that number by the variable net profit, to arrive at plaintiff's damages.[97]

The first, and perhaps most serious, defect in the damage theory advanced by Hayes and Leonard is the use of the "variable net profit" figure as the basis for determining lost profits. Both men admitted that variable net profit is *not* the equivalent of a net profit figure.[98] Variable net profit does not include allowance for additional fixed, semi-fixed or variable expenses which would be generated by the additional volume of new car sales. For example, the additional sales suggested by these men admittedly would have generated additional expenses for phone calls, stationery, used car maintenance, demonstration expenses, property and fire insurance, advertising, new car preparation, used car retailing and wholesaling expenses, property taxes, interest, computer services, employment taxes, social security, repossession expenses, etc.[99]

Although Mr. Hayes claimed that these additional expenses would be offset by additional gross profits generated by the parts and service departments, he was unable to offer proof that this was so. Dr. Leonard admitted that he could not support Mr. Hayes' position,[100] and this Court notes that Mr. Hayes' contention was, in fact, refuted by Mr. Hayes' own chart, Exhibit 70.

Comparing the year 1959 with that of 1963 on Exhibit 70,[101] the Court notes

---

96. Leonard Tr., pp. 30; 37–39; 179–82; 243–49. This figure was based on Hayes' calculation, and was simply "borrowed" by Dr. Leonard [Leonard Tr., pp. 243–44] who relied heavily on Hayes. [Leonard Tr., p. 39]. At one point, Leonard admitted that he had wanted to calculate net profit per new car, because he "wasn't terribly satisfied" with the variable net profit figure. [Leonard Tr., p. 244]. He further stated he could have calculated net profit, but that it would be a burdensome task, which he was not certain that he would be willing to undertake. [Leonard Tr., pp. 40–41; 267–68]. He also admitted that he wanted to eliminate profits on used cars and wanted to use a figure that was only based on the net profit per new car, but that Hayes had convinced him otherwise. [Leonard Tr., pp. 245–49].

97. Plaintiff's Exhibits 77 and 78.

98. Hayes Tr., p. 197; Leonard Tr., pp. 30–31; 183; 249–50.

99. See, for example, Hayes Tr., pp. 203–05; 240; 243–44; and Leonard Tr., pp. 30–38; 252; 249–80; 337–46; 362–67.

100. As stated before, Dr. Leonard used variable net profit because Hayes had convinced him not to use net profits, [Leonard Tr., p. 249] and admitted that he personally had no experience to support the position that additional expenses generated by additional sales would be offset by the fixed gross profit [Leonard Tr., pp. 37–38].

101. This time unit is selected for comparison because it constitutes plaintiff's predecessor's four full years in its old facility, elimi-

that new retail sales increased by 75 units. During this period, the fixed overhead expense [102] increased by $25,533.00 while the fixed gross profit [103] increased only $6,223.00. Thus, the fixed overhead expenses increased four times as fast as the offsetting revenues, and exceeded them by $19,310.00.

Comparing the year 1964 with that of 1968,[104] new retail sales increased by 57 units, fixed overhead expense increased $42,482.00, while fixed gross profit only increased $11,126.00, a difference of $31,356.00. Again, the fixed overhead expenses increased nearly four times faster than the offsetting revenues.

In short, it is clear that not only were plaintiff's own witnesses unable to support their assumptions that variable net profit and net profit were one and the same, but, additionally, that plaintiff's own exhibit establishes that this was not true.

The Court also notes its grave concern over the failure of the plaintiff to even attempt to separate damages as pertained to Pontiac sales, or to segregate damages for the period of permissible recovery, January 19, 1966 to April of 1967. Plaintiff made no attempt to allocate or proportionalize the expenses to each of its four product lines and related operations. See, Transit Advertisers Inc. v. New York, New Haven & Hartford Railroad, 194 F.2d 907, 911–912 (2d Cir.), cert. denied, 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952). *The jury could only speculate* as to whether the variable net for Pontiacs was more than, less than, or equal to that of Oldsmobiles, Ramblers, or GMC trucks, and as to whether the admitted additional expenses generated by additional sales, such as preparation costs or repossession expenses, would be the same, for example, for Pontiacs as for GMC trucks. The jury cannot engage in such speculation, and the plaintiff's failure to provide more definite information is fatal to its theory.

The Court further notes that the theory advanced by Hayes and Leonard is based upon assumptions foreign to the record, and both men refused to espouse the distribution systems on which their "lost sales" estimates were based. To arrive at his proposed damage figure,[105] Mr. Hayes chose the assumption that the distribution of Pontiacs to plaintiff and Porter should have been identical, even though he acknowledged knowing nothing about the distribution system actually used by Pontiac.[106] Dr. Leonard's figure was based on the unsupported assumption that distribution of Pontiacs to the two dealers should follow the ratio of family income, although he denied that this was a valid way to distribute Pontiacs.[107] He also testified that he

---

nating the need to account for a change in facilities.

102. Line 1, Exhibit 70. Fixed overhead expense is the salary and wage group, the semi-fixed and fixed expenses all added together. These are the expenses which, as they increase with additional volume, are supposed to be absorbed by an increase in the gross profits of the parts, service and accessories department, according to Mr. Hayes.

103. Line 2, Exhibit 70. Fixed gross profit is an accounting term which means, in this case, the gross profit of the parts and service departments.

104. Plaintiff and its predecessor's four full years in the new facility.

105. Regardless of what disclaimers might have been made, his figures were submitted to the jury for the exact purpose stated on the exhibit, which was to show the alleged "cumulative damage" incurred by Cecil Corley Motor Company, Inc.

106. Hayes admitted that he had no personal knowledge of the factors used in the week-to-week allocation of new Pontiacs. (Hayes Tr., p. 255). In fact, he had no knowledge of how any manufacturer distributed cars. (Tr., p. 267). Nor did he know what use Pontiac or any manufacturer made of registration data in distributing automobiles. (Tr., pp. 260; 459). He admitted that the Agreement itself contained no expressed provisions for the day-to-day method of distribution, nor did it delineate any factors to be used. (Tr. 268–69; 389–94; 494–97; 500–02).

107. Leonard Tr., pp. 9–10; 24; 26–27; 42; 172; 214–16; 348. Plaintiff's counsel dis-

was *not* claiming that plaintiff should have been entitled to receive under its Pontiac Agreement the number of cars as were indicated on his exhibits.[108] Nor did he mean to suggest that his charts reflected how Pontiac should distribute cars nationally.[109] Therefore, both Hayes and Dr. Leonard had to assume methods of distributing cars to plaintiff and Porter contrary to the evidence in the record to arrive at the number of cars they believed plaintiff would have, or should have received, and, having once established their assumptions, they offered no proof to support them, and actually disclaimed them, and refused to defend their positions, rendering full cross-examination impossible.

On this point, it has already been noted that Pontiacs were shipped to dealers only in response to orders.[110] There was absolutely no proof that plaintiff ordered Pontiacs in quantities sufficient to justify distribution to it in the amounts suggested by Hayes and Leonard, and Mr. Hayes specifically admitted that plaintiff had not placed enough orders to justify his figures.[111] Obviously, since cars were not shipped unless they were ordered, and since there was no proof that plaintiff ordered or wanted cars in the numbers suggested by Hayes and Leonard, then it follows that it was impossible for plaintiff to have been damaged in the amounts suggested by those witnesses. To reach their conclusions, the jury would have been forced to speculate on how many cars plaintiff *might have ordered if* it had decided to order more cars. Such wild, unsupported and unfounded speculation is totally impermissible.

In summary, then, this Court finds that the damage theory proffered by plaintiff is wholly inadequate and insufficient to support any award by the jury, for the reasons that it was based: (1) on a profit figure which was not an acceptable net profit; (2) upon assumptions concerning distribution and projected sales which were not supported by the record; (3) upon assumptions and conjectures specifically disclaimed by the witnesses who drew their conclusions therefrom; (4) upon the opinion of an expert who improperly based his assumptions upon that of another witness; (5) upon assumptions which made no attempt to separate lost profits or lost sales relating only to the Pontiac aspect of plaintiff's business as distinguished from its other operations (see note 113, infra); (6) upon assumptions which made no attempt to limit damages to the applicable period of potential recovery; and (7) upon speculation, conjecture and guesswork. There being no other evidence on damages, it follows that the proof was insufficient to allow the jury to reasonably infer that plaintiff had suffered damages in any amount.

## C. *Failure to Introduce, and Destruction of, Evidence*

This Court must note that the plaintiff had in its possession the means with which to calculate, with reasonable certainty, a net profit figure as to Pontiac automobiles. It could have used the stock record cards,[112] which reflected the sales transactions on all of plaintiff's new unit sales, and used cars taken in as trade-ins, repossessed, or purchased outright, in order to establish and compute

claimed that Leonard's theory was to be viewed as a method of distribution; nor was it to be considered as an absolute measure of damages allegedly sustained by Corley. (Tr., p. 10).

108. Leonard Tr., p. 348. However, he did make it clear that his damage estimate was based on the assumption that this would be the potential profit if Pontiacs *had* been distributed to the two dealerships in this manner, and if Corley had incurred no additional

expenses with the increased volume. (Tr., p. 215)

109. Leonard Tr., p. 214.

110. Corley Tr., pp. 499–500; 871–78; 1126–27; 1255; 1265; Hayes Tr., pp. 209–13; 295.

111. Hayes Tr., pp. 209; 295.

112. Exhibit FFFFF, which was made a part of the record by the defendant. Hayes Tr., pp. 38–50.

the average gross profit on new Pontiac units for each year. Expenses could then have been proportionalized in accordance with the porportion of actual Pontiac sales, so as to arrive at an average net profit figure for Pontiac automobiles.[113] However, plaintiff chose instead to go to the jury with less than the best available evidence on damages.

This Court is further constrained to note that while contemplating litigation,[114] and even after suit had been filed, plaintiff destroyed records which might have been used either to establish or disprove damages or liability.

■ When a litigant destroys, removes, or withholds records or documents while litigation is pending, or even while litigation is being contemplated, the strongest inferences may be drawn against that party which the opposing evidence in the record permits. In view of the testimony of plaintiff's own witnesses, the Court must infer that had the records not been destroyed or discarded while litigation was contemplated or pending, that they would have been unfavorable to the position of the plaintiff had they been introduced.

■ For all of the above reasons, the Court has reached the conclusion that the damage theory offered by plaintiff was legally unsound, and factually unsupportable. Therefore, even if the plaintiff had established facts sufficient to support a judgment in its favor, which it did not, this Court would decline to sustain any award of damages for this is not an instance where the defendant's actions prevented a more precise computation of damages. Rather, the fault lies in the plaintiff's failure to introduce any evidence. To award damages under these circumstances would have been to engage in impermissible speculation and conjecture. See, Siegfried v. Kansas City Star Company, 298 F.2d 1, 5–8 (8th Cir.), cert. denied, 369 U.S. 819, 82 S.Ct. 831, 7 L.Ed.2d 785 (1962).

## NEW TRIAL

■ Further examination of the record has confirmed the view of the Court that the evidence is so insufficient to support the verdict, and the verdict so contrary to the weight of the evidence, that in any event a new trial should be, and is, hereby ordered. Turner v. United States, 229 F.2d 944, 946 (6th Cir. 1956). A motion for a new trial is addressed to the sound discretion of the Court, and should be granted if it will do substantial justice. The trial judge has a responsibility to weigh the evidence and to set aside the jury's verdict when, in his conscientious opinion, the verdict is contrary to the weight of the evidence. 6A Moore's Federal Practice, § 59.05 [5].

All of the authorities and references to the record discussed in this opinion militate in favor of a new trial, in the event that this Court's judgment N.O.V.

---

113. The Court requested that plaintiff undertake such calculations based on the stock record cards, but this request went unheeded. (Hayes Tr., p. 100). However, prior to trial, in response to an order of this Court directing plaintiff to further answer certain interrogatories propounded to it by General Motors, plaintiff was able to compute net profit as to each make of new cars and trucks, (Plaintiff's additional answers to Interrogatories 37 through 45; Hayes Tr., pp. 34–35), but did not offer this to the jury. Its excuse, as stated in the answers to interrogatories and by counsel in open court, was that the net profit computations did not, in effect, present an "accurate" picture. (Hayes Tr., pp. 29–36). This Court can only assume that such computations would

have been disadvantageous to plaintiff.

114. Mr. Tom Kerkeles testified that plaintiff Cecil Corley had told him he was anxious to bring suit against Pontiac in the Spring of 1967. Cecil Corley, Jr. also admitted that at least as early as November 1967 his attorney had advised General Motors of plaintiff's intention to sue. (Tr., pp. 953–54). In addition to Kerkeles's testimony, ample evidence exists in the record that plaintiff had in mind suing Pontiac as early as April, 1967. (Corley Tr., pp. 867–85; 953–60). On destruction of records, see p. 830, fn. 11, supra. Dr. Leonard also testified that if those orders had been available, it would have been helpful. (Leonard Tr., p. 328).

should be set aside on appeal. However, apart from all of this there is an additional ground on which this Court would grant a new trial absent these other considerations—the conduct of plaintiff's principal witness, its president Cecil Corley, Jr., on the witness stand.

Mr. Corley's conduct was such as to create undue sympathy for plaintiff and prejudice to Pontiac Motor Division. Mr. Corley repeatedly and, this Court believes, intentionally used prejudicial and inflammatory terms, such as "bogus", "fraudulent," and "illegal," when describing the activities of General Motors and Paul Porter.[115] He continuously made unfavorable, disparaging, and totally unfounded accusations and remarks designed to cast aspersions upon the character and integrity of General Motors, its employees and trial counsel,[116] and to emphasize the relative size and economic position between plaintiff and General Motors, and the expenses incurred by plaintiff in prosecuting this case through trial.[117] Additionally, he made repeated references to his health, and even managed to cry on one occasion.[118]

■■■ Mr. Corley appeared to this Court to be an intelligent man, capable of knowing what he was doing, and certainly able to understand and heed the Court's instructions.[119] And yet in spite of the Court's repeated admonishments,[120] this Court believes that Mr. Corley intentionally disregarded its di-

115. See, for example, Corley Tr., pp. 83; 86–89; 159; 196–97; 262; 308–10; 314; 330–33; 415; 635; 639; 655–59; 930; 941; 986–90; 1179; 1201; 1204. However, when records had been made available which would have allegedly substantiated these claims, he failed to even examine them. See page 839, fn. 47, *supra*.

116. Without any proof, Mr. Corley accused one General Motors Regional Manager, Lonnie Holmes, of being immoral and a drunkard, and he admitted that his similar accusation against Mr. Brooks, a Zone Manager, was based on hearsay. (Corley Tr., pp. 626–27). He accused one unidentified service representative of being fired for writing bad checks (Corley Tr., p. 41). He accused Zone officials of taking bribes from large dealers in exchange for favors, (Corley Tr., pp. 368–69) and his counsel assured the Court that proof would be forthcoming, although none was, except for an absurd reference to a Christmas ham. (Corley Tr., pp. 330–31; 368–69). He implied that General Motors and its counsel had withheld discovery material, and had declined to furnish all available documents. (Corley Tr., pp. 507–22; 587; 592; 660; 1111). See also, Corley Tr., pp. 368–69; 387; 430; 435; 438–39; 471; 479–81; 483; 486–87; 493; 564–67; 574–77; 599–607; 626–30; 685–708; 788–93; 801–04; 807–10; 855–67; 916–17; 953–60; 980; 1236; 1261–64; 1391–93; Exhibits II; V; AA; CC; PP; TTTT; UUUU; VVVV; WWWW; YYYY; ZZZZ.

117. See for example, his references to his inadequate investigative position (Corley Tr., p. 660), his allusions to General Motors' size and its alleged holdings (Corley Tr., pp. 665–66), and his most damaging reference to the amount of money he had spent on the lawsuit. (Corley Tr., pp. 662–63). Even his own counsel acknowledged that these remarks were prejudicial to General Motors. (Corley Tr., pp. 1010–11).

118. Corley Tr., pp. 30; 593; 694–700. Also see generally: 69 A.L.R.2d 954, Manifestation of Emotion; 32 A.L.R.2d 9, Argument on Wealth or Poverty; 29 A.L.R.2d 996, Prejudicial Effect of Argument or Remark that Adversary was Attempting to Suppress Facts; 57 A.L.R. 62, Conduct of Party in Court Room.

119. The Court advised plaintiff's counsel during trial that it believed Mr. Corley "is too smart to be doing what he is doing . . . He is just not that stupid." (Corley Tr., p. 672).

120. The Court found it necessary to admonish Mr. Corley to stop making speeches (Corley Tr., pp. 174; 185; 1244–45; 1310; 1469), stop editorializing (Corley Tr., pp. 61; 122; 199; 519; 736; 1471; 1474; 1494), and cut out the side comments (Corley Tr., pp. 30; 155; 329; 346; 554; 666–68; 801; 806; 875; 1039; 1302; 1412; 1500; 1521). The Court insisted that he answer directly and not insert extraneous material (Corley Tr., pp. 77; 174; 553; 554; 668; 847; 882; 898; 931; 935; 1038; 1189; 1326); and even called on plaintiff's counsel for aid in keeping him under control (Corley Tr., pp. 199; 373; 627). Additionally, it was frequently necessary to ask the jury to disregard his side remarks (Corley Tr., pp. 41; 77; 147; 365; 368; 592–93; 662–63; 793; 805).

rections and continued to inject prejudicial and inflammatory comments so as to curry the passion and sympathy of the jury. In all candor, a thorough study of this record has only served to further incense this Court over Mr. Corley's deliberate abuse of the Court's patience. His testimony, as a whole, had not only a highly prejudicial effect, but was compounded because of the cumulative effect on the repetition. The many attempts of this Court to cure such prejudicial remarks simply could not remove from the minds of the jury the improper impressions made. One or several acts of impropriety on the part of a party may be overlooked with proper instructions given by the Court, but the Court cannot close its eyes where the record shows a persistence upon a witness's part in bringing improper and irrelevant matters to the attention of the jury, comments which can only serve to inflame their minds and thus render them less able to serve justice.

 The trial judge has the inherent right, if it believes a fair trial has not been had, as it does in this case, to set aside the judgment and grant a new trial. It is the view of this Court that the testimony given by Cecil Corley, Jr., was reasonably calculated to cause, and did cause, an improper judgment to be rendered. Additionally, Mr. Corley's persistence, his repetition, and his reiteration of improper comments, in spite of, and in disregard of, this Court's rulings, multiplied the error and added potency to the prejudice. Certainly, the case on liability was insufficient to support the verdict, and, judging from the verdict, it affirmatively appears to the Court that undue prejudice did result, to the extent that this Court's attempts to obviate this possibility were apparently unsuccessful. Accordingly, this Court will avail itself of its last opportunity to correct this error, by granting a new trial in the case of Cecil Corley Motor Company, Inc. v. General Motors Corporation. Counsel for General Motors will prepare and submit an order in accordance herewith.